## CLEMENT v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 12, 1906.)

No. 2,377.

**1. GRAND JURY—SELECTION—FEDERAL COURTS—"JUDICIAL DISTRICT."**

Act Cong. May 11, 1858, c. 31 (11 Stat. 285), created the state of Minnesota into one federal judicial district, and Act March 3, 1859, c. 76 (11 Stat. 402 [U. S. Comp. St. 1901, pp. 316, 446]), provided for the holding of terms of court in three different cities. Act April 26, 1890, c. 167, § 1, 26 Stat. 72 [U. S. Comp. St. 1901, p. 374], declared that, for the purpose of holding terms of court, the district of Minnesota was divided into six divisions, and section 6 that grand and petit juries should be summoned for each of the terms of such court, and the petit jury should be competent to sit and act as such jury in either the Circuit or District Court at such terms. Act Cong. July 12, 1894, c. 132 (28 Stat. 102 [U. S. Comp. St. 1901, p. 376]), provided that all criminal proceedings instituted for the trial of offenses against the laws of the United States arising in the district of Minnesota shall be brought, had, and prosecuted in the division of the district in which the offenses were committed. *Held*, that a federal grand jury was not required to be drawn from the division of the district in which the offense to be investigated was committed, but might be properly summoned from any portion of the state constituting "the district," regardless of the place where the prosecution was triable.

**2. JURY—PETIT JURY—SELECTION—FEDERAL COURTS.**

Act Cong. April 26, 1890, c. 167, § 1, 26 Stat. 72 [U. S. Comp. St. 1901, p. 374], divides the judicial district of Minnesota into six divisions, and section 6 provides that the grand and petit juries shall be summoned for each of the terms of Circuit or District Court, and that the petit jury shall be competent to sit and act as such jury in either of such courts. Act July 12, 1894, c. 132, 28 Stat. 102 [U. S. Comp. St. 1901, p. 376], requires all criminal proceedings instituted for the trial of offenses against the United States arising in the district of Minnesota to be brought, had, and prosecuted in the division of the district in which the offenses were committed. Rev. St. § 563 [U. S. Comp. St. 1901, p. 455], confers on District Courts of the United States jurisdiction of all crimes and offenses cognizable under the authority of the United States committed within their districts, and Const. Amend. 6, declares that in all criminal proceedings the accused shall enjoy the right to a trial by a jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law. *Held*, that a petit jury for the trial of federal offenses arising in Minnesota might be properly summoned from any portion of the state, and that accused was not entitled to a jury exclusively summoned from the division of the district in which he was triable.

**3. CRIMINAL LAW—APPEAL—CONTINUANCE—DISCRETION—REVIEW.**

The denial of an application by accused for a continuance will not be reviewed on a writ of error, in the absence of a showing that the trial court's discretion was abused.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, §§ 3045-3049.]

**4. SAME—CONTINUANCE—INFIRMITY OF ACCUSED—DISCRETION.**

Accused, an aged bank president, was arrested February 6, 1905, charged with violating the national banking law, and was indicted on June 9th. In the meantime he was in his usual state of health, but was quarantined because of a contagious disease in his family. After an unavailing demurrer to the indictment and the entry of a plea of not guilty, he applied for a continuance on physicians' affidavits that he was in such a feeble and weak condition that he was unable to endure the strain attendant on a protracted trial, and his own affidavit that he was so infirm as to be unable to make the requisite preparation for trial.

149 F.—20

A counter affidavit alleged that the government's witnesses were all aged and infirm, and for that reason their attendance at the next term of court was uncertain. The court denied the continuance, reciting in its order that the trial could be conducted in short sessions, and set the case for trial on June 21st. On that day a similar motion was unsuccessfully made before another judge, and after the government had closed its case on June 30th the hearing was adjourned to July 5th. *Held*, that the denial of the continuance was not an abuse of discretion.

**5. SAME—INDICTMENT—DEMURRER—PREJUDICE.**

Accused was indicted for violating the national banking act under an indictment containing 27 counts. He demurred unsuccessfully to 10 counts, and was found guilty on 24, and sentenced to a term of 8 years in the penitentiary on each count, with a provision that time should run on all concurrently. *Held* that, as the sentence did not exceed that which might rightfully have been imposed on any one count, defendant was not prejudiced by the overruling of his demurrer to 10 counts of the indictment.

**6. SAME—MOTION IN ARREST—TIME.**

While accused may raise the question of the sufficiency of the indictment to charge a public offense by motion in arrest of judgment, it is better practice to raise the question by demurrer.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 2454.]

**7. INDICTMENT—SUFFICIENCY—STATUTES.**

Under Rev. St. § 1025 [U. S. Comp. St. 1901, p. 702], providing that, so far as possible, consistent with assuring accused a fair and impartial trial, the court shall disregard form, imperfection of statement, and unimportant defects which do not reasonably tend to prejudice accused, an indictment is sufficiently certain if it alleges facts sufficient to enable accused to make his defense, and to plead the judgment in bar of any further prosecution for the same offense.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, §§ 177-179.]

**8. SAME—CONSTRUCTION OF.**

Technical accuracy must yield to the fair and obvious meaning of the language employed, when tested by the ordinary rules of construction, and regard must be had to the necessity of punishing the guilty, as well as acquitting the innocent.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, § 174.]

**9. BANKS AND BANKING—NATIONAL BANKING ACT—VIOLATION—INDICTMENT.**

A count in an indictment for violating the national banking act alleged that accused, as president of the bank, made an entry in the bank's daily journal of the words and figures following: "Other Real Estate, A. Barton Farm, $3,350.00;" that the entry indicated that the south half of a specified quarter section of land was a certain 80-acre tract known as the "Barton Farm," and was an asset of the bank in the sum of $3,-350.00; that the entry so made was false, in that the same described land was not then and there an asset of the bank of the value of $3,-350.00, or of any sum whatsoever. *Held*, that such count was not defective as failing to charge that the A. Barton farm was known or described in accordance with the description recited, or was identified therewith, or because it was not charged that the A. Barton farm was not an asset of the bank.

**10. SAME—FALSE REPORTS.**

Rev. St. § 5209 [U. S. Comp. St. 1901, p. 3497], provides that every president of a national bank who makes any false entry in any book or report of the association, with intent to injure or defraud it or any other person, company, or body politic or corporate, shall be guilty of a misdemeanor, etc. *Held*, that an indictment under such section, alleging that

accused, while acting as president of a national bank, made a false entry in a report to the Comptroller of Currency, that the lawful money reserve in the bank, consisting of gold coin, was $23,955, when in fact the bank only had $21.955 in gold coin as lawful money reserve, was not objectionable for want of an allegation that the lawful reserve exceeded the amount the bank actually had on hand; the gist of the offense being the making of false entries in the report.

11. SAME—INTENT TO DECEIVE.

Rev. St. § 5209 [U. S. Comp. St. 1901. p. 3497], provides that, if any president of a national bank makes any false statement concerning the association with intent to injure or defraud the association or any other company, body politic, or any individual person, or to deceive any officer of the association, or any agent selected to examine the affairs of any such association, he shall be guilty of a misdemeanor. *Held* that, where the president of a national bank made a false report to the Comptroller of the Currency with intent to deceive an examiner who might be appointed to make an examination of the bank, as provided by section 5240 [U. S. Comp. St. 1901, p. 3516], such act constituted an offense, irrespective of the existence of any other incidents disjunctively mentioned in section 5209.

12. SAME—EVIDENCE.

In a prosecution of the president of a national bank, evidence *held* sufficient to justify a conviction for willfully misapplying the bank's funds, and converting the same to the use of himself or others, in violation of Rev. St. § 5209 [U. S. Comp. St. 1901, pp. 3491, 3497].

13. SAME—EVIDENCE—CERTIFICATE OF COMPTROLLER OF CURRENCY.

Where a certificate of the Comptroller of the Currency recited that a certain bank had complied with all the provisions of the act of Congress of July 12, 1882, authorizing an extension of the corporate existence of such banks, and declared that the bank was authorized to have succession until November 21, 1908, such certificate was conclusive evidence, in a prosecution of the president of the bank for violating the national bank act, of a compliance by the bank with all necessary conditions precedent to the extension of its charter.

14. SAME—NATIONAL BANK CHARTER—EXTENSION—ACCEPTANCE.

Where a national bank continued its existence and performed the functions of such an association after the expiration of its original corporate existence for a long period of time, it would be presumed to have accepted the benefit of a certificate executed by the Comptroller of Currency extending its corporate existence.

In Error to the District Court of the United States for the District of Minnesota.

The defendant, Clement, was indicted in the District Court of the District of Minnesota for the Third Division for making false entries and willful misapplications of the funds and credits of the First National Bank of Faribault, of which he was at the time president, in violation of section 5209 of the Revised Statutes [U. S. Comp. St. 1901, p. 3497]. He in due time challenged the panels of the grand and petit juries because they were drawn from the district at large. and were not composed of persons who resided in the Third Division of the district. He demurred to some counts of the indictment on the ground of duplicity. He moved for a continuance of the case at the time it was first set for trial on the ground that physical infirmities disabled him from preparing for trial at that time. He interposed at the close of the case a demurrer to the evidence, on the ground that it failed to establish the commission of any of the offenses charged. He filed a motion in arrest of judgment on the ground that the indictment charged no criminal offenses. These challenges, demurrers, and motions were overruled, the trial was had, and defendant found guilty on 24 of the 27 counts of the indictment, and sentenced to a term in the penitentiary of 8 years on each count, with the provision that time should run on all concurrently. Exceptions having

been duly saved to the foregoing rulings, the case is brought here for review by writ of error.

George N. Baxter (Daniel W. Lawler, on the brief), for plaintiff in error.

Paul A. Ewert (Charles C. Houpt, on the brief), for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Was the grand jury properly summoned? By the act, admitting Minnesota into the Union, of May 11, 1858 (chapter 31, 11 Stat. 285), and by other provisions of law, Minnesota was made to constitute one judicial district. Provision was made for the appointment of a district judge for the district, and for the holding of terms of court at Preston (later at Winona) and St. Paul. Sections 531, 551, Rev. St. [U. S. Comp. St. 1901, pp. 316, 446]; Act March 3, 1859, c. 76, 11 Stat. 402. By the act of April 26, 1890 (chapter 167, § 1, 26 Stat. 72 [U. S. Comp. St. 1901, p. 374]), it was enacted as follows:

"That for the purpose of holding terms of court the district of Minnesota is hereby divided into six divisions to be known as the 1st, 2d, 3d, 4th, 5th, and 6th divisions."

The counties constituting these divisions, the terms and places for holding the court therein were then designated, and section 6 of the act provides as follows:

"That the grand and petit jury shall be summoned for each of said terms, which petit jury shall be competent to sit and act as such jury in either or both of said courts [circuit or district] at such terms."

By the act of July 12, 1894 (chapter 132, 28 Stat. 102 [U. S. Comp. St. 1901, p. 376]), it was enacted as follows:

"That all criminal proceedings instituted for the trial of offenses against the laws of the United States arising in the district of Minnesota shall be brought, had and prosecuted in the division of said district in which offenses were committed."

From the foregoing acts, which constitute all the legislation bearing on our present inquiry, it seems clear that only one judicial district has ever been established in the state of Minnesota; that this district has been divided for the convenience of suitors in the trials of causes into six divisions, not as general or separate judicial districts, with an independent court for each, but for the limited purpose disclosed by the act of 1890, "of holding terms of court" in the district of Minnesota. The Revised Statutes (section 563 [U. S. Comp. St. 1901, p. 455]) give to the District Courts of the United States jurisdiction "of all crimes and offenses cognizable under the authority of the United States committed within their respective districts"; in other words, the jurisdiction of a district court is by law made coextensive with the territorial area of the district, and, unless limitations are found in the congressional acts, the right to draw a grand jury from the district as a whole would seem to be unquestionable. We are, however, not left

without controlling authority on this proposition. The Supreme Court in Logan v. United States, 144 U. S. 263, 297, 12 Sup. Ct. 617, 36 L. Ed. 429, considering similar legislation for the state of Texas, decided adversely to the contention of the defendant in this case. Referring to a provision of that legislation similar to that found in the act of June 12, 1894, supra, Mr. Justice Gray, speaking for the court, says:

"This provision does not affect the authority of the grand jury for the district sitting at any place at which the court is appointed to be held to present indictments for offenses committed anywhere within the district. It only requires the trial to be had and writs and recognizances to be returned in the division in which the offense is committed. The finding of the indictment is no part of the trial."

In Post v. United States, 161 U. S. 583, 587, 16 Sup. Ct. 611, 40 L. Ed. 816, the Supreme Court had under consideration the legislation to which attention has already been called relating to the creation and division of the district of Minnesota, and, after citing with approval the extract just quoted from the Logan Case, Mr. Justice Gray, again speaking for the court, says:

"Criminal proceedings cannot be said to be brought or instituted until a formal charge is openly made against the accused, either by indictment presented or information filed in court, or, at the least, by complaint before a magistrate."

In Rosencrans v. United States, 165 U. S. 257, 260 and 261, 17 Sup. Ct. 302, 304, 41 L. Ed. 708, Mr. Justice Brewer, speaking for the Supreme Court, after calling attention to sections 563 and 629 of the Revised Statutes [U. S. Comp. St. 1901, pp. 455, 503], giving to District and Circuit Courts jurisdiction of the crimes and offenses committed within their respective districts, says:

"These statutes declare the general rule that jurisdiction is coextensive with district. That being the general rule, no mere multiplication of places at which courts are to be held or mere creation of divisions nullifies it. Indeed, the place of trial has no necessary connection with the matter of territorial jurisdiction. * * * We find many acts, some increasing in a district the places of trial, and others in terms subdividing the district into divisions. The former have no effect on the matter of jurisdiction. Some of these latter acts specifically limit the jurisdiction in criminal actions of the courts held in a division to the territory within that division [giving instances], while, on the other hand, some contain no such provision, as in the case of Minnesota (Act April 26, 1890)."

In Barrett v. United States, 169 U. S. 218, 18 Sup. Ct. 327, 42 L. Ed. 723, the Supreme Court, construing acts of Congress relating to South Carolina, held that a division of the state into "two districts," geographically speaking, did not divide the state into two judicial districts, so as to confine the jurisdiction of the Circuit Court to the territorial limits of each separate "district."

The foregoing authorities are conclusive of the proposition that the finding of the indictment against Clement by a grand jury drawn from the body of the district of Minnesota for a crime committed in the Third division of the district is not a violation of the provisions of the act of July 12, 1894, but, on the contrary, in harmony with them.

Was the petit jury lawfully summoned from the body of the district, or should it have been summoned from the counties composing the

Third division of the district? Argument is drawn from the rule of the common law requiring juries to be summoned from the vicinage where the crime is committed, so that the accused can have the benefit of his own good character and standing, if he has such, and of such knowledge as the jury may possess of the character of witnesses who may testify for and against him. A full recognition of this rule still leaves the question, what is the vicinage, open. We think the sixth amendment to the Constitution answers it. It ordains that:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law."

By the judiciary act of 1789, and afterwards by acts providing for the admission into the Union of states other than the original 13, Congress, from time to time, ascertained and divided the several states into judicial districts, in harmony with the requirement of the constitutional provision just referred to. In the exercise of its delegated power, Congress, as seen in the legislation already referred to, created but one district out of the state of Minnesota.

In discussing this article of the Constitution, learned counsel for defendant has ingeniously argued that, even if the entire state is one district for some judicial purposes, it is not the district previously "ascertained by law *for the trial of indictments for criminal offenses.*" It may not be the district ascertained by law for the trial of such indictments, and at the same time it may be the judicial district ascertained by law from which an impartial jury is to be summoned. The sixth amendment does not use the italicized language; it stops with the provision requiring the district from which the jury is to be taken to be ascertained by law. There is obviously a distinction between the purpose of ascertaining the district, as contended for by defendant's counsel, and the purpose of ascertaining the district contemplated by the amendment. Article 3, sec. 2, of the Constitution, provides that the trial shall be held in the state where the crime was committed. The sixth amendment, among other things, conferred the right of trial by jury, and guarantied that the jury should be taken from the state if composed of only one district or from that particular district in the state containing more than one wherein the crime was committed; and for the purpose of rendering certain that particular district, provision was made for its being previously ascertained by law. The Logan, Post, Rosencrans, and Barrett Cases, supra, are ample authority that different places provided as a matter of convenience for the trial of offenses committed within a district may be and frequently are fixed by law without affecting the general jurisdiction of the courts over the whole district. The district for the latter purpose, according to the command of the sixth amendment, as construed by the foregoing cases, must be ascertained and fixed by law as a judicial district; and when so ascertained and fixed, and not till then, it bounds and limits the territory from which a jury may be summoned to try cases originating therein. If acts establishing separate courts within a given district for the convenience of suitors should by clear provision limit their jurisdiction and the area from which juries are to be summoned to

smaller territory, such acts would doubtless create separate judicial districts, and require juries to be summoned therefrom. But there is no such purpose manifested in the acts relating to Minnesota. Although they subdivide the one judicial district, clearly and unambiguously created, into six subdivisions "for the purpose of holding terms of court," they evince no purpose to establish those subdivisions as separate judicial districts, within the meaning of the sixth amendment.

There was no error in overruling defendant's challenge to the panel of petit jurors.

Did the court below err in refusing defendant's application for a continuance? It is settled by the uniform current of authority that the decision of the trial court upon such an application is purely discretionary, and not subject to review unless its discretion was abused. Isaacs v. United States, 159 U. S. 487, 489, 16 Sup. Ct. 51, 40 L. Ed. 229; Goldsby v. United States, 160 U. S. 70, 16 Sup. Ct. 216, 40 L. Ed. 343. The question is, therefore, do the facts of the case show that the learned trial judge acted in the exercise of a sound and reasonable discretion in denying the motion for a continuance, or do they show that he abused that discretion? Clement was arrested February 6, 1905, charged in the complaint with some of the offenses afterwards charged in the indictment found against him on June 9th. Between these last-mentioned dates he was in his usual state of health, but was quarantined at home for a period of about one month by the presence in his family of a contagious disease. After an unavailing demurrer to the indictment and the entry of a plea of not guilty the motion for a continuance was made. It was supported by affidavits of physicians and others, tending to show that Clement was in a feeble and weak condition, and unable to endure the strain attendant upon a protracted trial, and his own affidavit to the same effect, and also to the effect that he was unable, by reason of his infirm condition, to make the requisite preparation for his trial. A counter affidavit was filed by the United States attorney, tending to show that the cashier and directors of the Faribault bank, upon whom the government relied for evidence in the case, were all aged and infirm, and for that reason uncertain to attend court at its next term. The court below, then presided over by Judge Lochren, after considering the motion, on June 14, 1905, denied it, assigning the following reasons:

"That the defendant is feeble is apparent from his appearance, and that condition is the result of his age, for one thing, and of his mental disturbance on account of his misfortunes and the charges that are made against him at this time. The serious question is whether there is a probability of his being in any better condition if the case should be adjourned or continued until the next term of court. There is no special physical disability, except age, and that certainly would not be mended. The defendant does not appear physically unable to be in court, and the testimony shows, and I think it was apparent from his appearance, that he ought not to be subjected to the strain of long-continued mental work connected with this matter without opportunities to rest; at least, it would be hard for him. But in that respect, the manner of trial can be conducted so as to obviate any severe strain, by not having very long sessions in a day. It is not clear to me that he will be in any better condition six months from now than he is now. I do not think the showing makes that clear. I think the motion should be denied."

The case was then set for trial on June 21st. On that day a motion for a continuance was again made, reinforced by the same and other similar affidavits. That motion was heard by Judge Morris, who then presided, and was denied by him for the reasons stated by Judge Lochren. On June 22d, after an unsuccessful challenge of the panel of petit jurors, the trial began. On June 30th the government closed its case, when, after an unsuccessful demurrer to the evidence, the further hearing was continued to July 5th. After the verdict a motion for a new trial was made, and the court's attention again called to the defendant's physical condition and inability to properly prepare for trial as important grounds of the motion.

We are impressed by the careful and repeated consideration given to defendant's application by the trial court that the judges acted with great deliberation and consideration for defendant, and decided adversely to him out of a deep sense of the demands of public justice, as well as with due regard for his own welfare. In view of the reasons assigned for overruling the motions for continuance, the assurances then given that the trial would be conducted so as to obviate any severe strain by not having long sessions in a day, the length of the trial, the postponement of it for about a week after the government closed its evidence before the defendant was required to proceed, the refusal to grant a new trial to defendant, and the well-earned reputation for fairness and impartiality of the two district judges who acted on the respective applications for continuance, we think it is fair to presume that the trial was actually conducted with due regard to the age and physical condition of the defendant, and certainly that there was no abuse of the discretion lodged in the trial judges in denying the motions for continuance. It was held at an early day that the ruling of a trial court on an application for a continuance could not be assigned as error. Woods v. Young, 4 Cranch (U. S.) 237, 2 L. Ed. 607. The doctrine of that case has, however, been modified to the extent already indicated, that abuse of the discretion can be assigned for error.

The cases of Goldsby v. United States, supra, and Youtsey v. United States, 38 C. C. A. 562, 97 Fed. 937, present facts very similar in many of their phases to those now before us. The Supreme Court in the one case and the Circuit Court of Appeals for the Sixth Circuit in the other held that the denial of a continuance in such circumstances did not constitute abuse of discretion. Those cases, by reason of their close similarity to this, are interesting and instructive on the question now before us. In view of all the facts which we have carefully considered, and in the light of the authorities referred to, we have reached the conclusion that no error was committed in denying the motions for continuance, and that substantial justice required no postponement of the trial.

Does the indictment sustain the judgment? Defendant at the outset demurred to 10 counts of the indictment on the ground of duplicity. An examination of them discloses that they were not obnoxious to that objection. Moreover, the sentence on each of the 10 counts was the same as that imposed on each of the other 14, and all ran concurrently.

Even if the 10 should have been held bad on demurrer, the same judgment and sentence, based on each of the other 14 counts, which did not exceed that which might lawfully be imposed on any one, cannot be disturbed for that reason. Claassen v. United States, 142 U. S. 140, 12 Sup. Ct. 169, 35 L. Ed. 966; Evans v. United States, 153 U. S. 584, 14 Sup. Ct. 934, 38 L. Ed. 830; Ballew v. United States, 160 U. S. 187, 16 Sup. Ct. 263, 40 L. Ed. 388; Putnam v. United States, 162 U. S. 687, 704, 16 Sup. Ct. 923, 40 L. Ed. 1118; Peters v. United States, 36 C. C. A. 105, 94 Fed. 127; Gardes v. United States, 30 C. C. A. 596, 87 Fed. 172, 182.

A motion in arrest of judgment challenged the sufficiency of all the counts on the ground that they did not set forth facts constituting a public offense. No timely demurrer was filed before the expense and trouble of a protracted trial had occurred, but after an adverse verdict the defendant for the first time raised the question of the legal sufficiency of the indictment by a motion to arrest the judgment. This is not good practice. It imposes an unnecessary burden in many cases upon the court, upon the government, and upon the accused. It may also be prejudicial to the latter. While he may, by a motion in arrest, raise the question whether the substance of the crime is charged against him, he may also, by delaying till after verdict, deprive himself of advantages which he might have secured by timely application. Dunbar v. United States, 156 U. S. 185, 192, 15 Sup. Ct. 325, 39 L. Ed. 390; Rosen v. United States, 161 U. S. 30, 33, 16 Sup. Ct. 434, 40 L. Ed. 606.

Learned counsel for defendant, in arguing the legal sufficiency of the present indictment, urges us to recognize and apply the criterion of the hornbooks of the law that certainty to a common intent is not sufficient, but that a high degree of certainty in every particular is required. This was anciently the fixed rule of criminal pleading, but of late years its rigidity has been somewhat relaxed. The well-known canons of construction employed to ascertain the meaning of written instruments should not be ignored to secure mere technical accuracy, when that is unnecessary for the legitimate protection of the accused. Language should not be strained either to convict or to acquit; it should receive a reasonable and fair interpretation to accomplish, on the one hand, the indispensable purpose of fairly apprising the accused of the charge against him, so that he may intelligently prepare to meet it, and be enabled to make use of an acquittal or conviction to protect himself against another charge for the same offense; and, on the other hand, to enable the government without unnecessary embarrassment to effectually enforce its laws and bring the guilty to punishment. We must so far as possible, consistently with insuring an accused person a fair and impartial trial, guarantied to him by the Constitution and laws, disregard form, imperfection of statement, and unimportant defects, which do not reasonably tend to the prejudice of the accused. This we are commanded to do by positive law (section 1025, Rev. St. [U. S. Comp. St. 1901, p. 702]) as well as by repeated admonitions of the Supreme Court.

Mr. Justice Harlan, in the case of Rosen v. United States, supra,

speaking for the Supreme Court concerning the meaning of our constitutional provision requiring the accused to be "informed of the nature and cause of the accusation," says as follows:

"The defendant is informed of the nature and cause of the accusation against him if the indictment contains such description of the offense charged as will enable him to make his defense and to plead the judgment in bar of any further prosecution for the same offense."

In the same case he shows that reasonable inferences should be indulged in construing the language of indictments. One of the objections to the indictment involved in that case was that the government failed to allege that the defendant knew that the matter alleged to have been mailed was obscene, etc. On this subject he observes as follows:

"The indictment on its face implies that the defendant owned or managed the paper. * * * He must have understood from the words of the indictment [that he unlawfully, willfully, and knowingly deposited and caused to be deposited the alleged obscene paper] that the government imputed to him knowledge or notice of the contents of the paper so deposited. * * * The ordinary acceptation of the words 'unlawfully, willfully, and knowingly,' when applied to an act or thing done, imports knowledge of the act or thing so done, as well as an evil intent or bad purpose in doing such thing."

He concludes that the case before him "was not one of total omission from the indictment of an essential averment, but, at most, one of the inaccurate or imperfect statement of fact."

Mr. Justice Brewer, in Dunbar v. United States, supra, was discussing a criminal offense which by law consisted of "smuggling opium prepared for smoking," but which was by the indictment alleged to consist of "smuggling prepared opium." He held in that case that by referring to the tariff schedules the words "prepared opium" could be seen to be essentially the equivalent of the words "opium prepared for smoking." He uses the following language:

"The pleader is at liberty to use any form of expression, provided only that he thereby fully and accurately describes the offense, and the entire indictment is to be considered in determining whether the offense is fully stated."

He lays down a broad general rule in the following language:

"Any words of description which make clear to the common understanding the articles in respect to which the offense is alleged are sufficient."

He then says:

"There can be no doubt, that the defendant knew exactly what he was charged with having smuggled, and that the description was so precise and full that he could easily use a judgment under these indictments in bar of any subsequent prosecution."

Mr. Justice Brown, in Evans v. United States, 153 U. S. 584, 590, 14 Sup. Ct. 934, 937, 38 L. Ed. 830, says:

"While the rules of criminal pleading require that the accused shall be fully apprised of the charge made against him, it should, after all, be borne in mind that the object of criminal proceedings is to convict the guilty as well as to shield the innocent, and no impracticable standards of particularity should be set up whereby the government may be intrapped into making allegations which it would be impossible to prove."

· Likewise Mr. Justice Brown in Cochran v. United States, 157 U. S. 286, 290, 15 Sup. Ct. 628, 630, 39 L. Ed. 704, says:

"Few indictments under the national banking law are so skillfully drawn as to be beyond the hypercriticism of astute counsel; few which might not be made more definite by additional allegations. But the true test is not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction."

In the light of the foregoing reasonable and practicable rules, we have examined the several counts of the indictment in the case now before us, and do not hesitate to say that, tested by them, every count is good; in fact, the counts sufficiently state offenses within the strict rule of certainty advocated by learned counsel for the defendant.

The second count, so far as it is necessary to state it to bring out the points of objection to it, charges: that the defendant, while president of the bank, made in its daily journal a certain entry in words and figures following: "Other Real Estate, A. Barton Farm, $3,350.00." That the entry purported to show, and did, in substance and effect, indicate and declare, "that the south ½ of the N. W. ¼ of sec. 27, town 109, range 22, was a certain 80-acre tract of land, and was known as the 'Barton Farm,' and was an asset of the said bank in the sum of $3,350." That the entry so made was false in this: "That the said south ½ of N. W. ¼ of sec. 27, town 109, range 22, was not then and there an asset of the said bank," of the value of $3,350, or of any sum whatsoever. It is argued that this count fails to charge the commission of a criminal offense, because there is no allegation that the "A. Barton Farm" referred to in the entry was known or described as the S. ½ of N. W. ¼ of sec. 27, township 109, range 22, or was identical with it, and also because there is no allegation that the "A. Barton Farm" was not an asset of the bank. This contention is without merit. The count charges that the entry made by the defendant purported to show, and did in substance declare, that the land so described by fractions of section was known as the Barton farm, and was an asset of the bank in the sum of $3,350. Afterwards the meaning of the entry as so averred was falsified by the unequivocal statement that the land as so described was not an asset of the bank. It is true it is not averred in words that the "A. Barton Farm" was known or described as the S. ½ of N. W. ¼, etc.; neither is it averred in words that the "A. Barton Farm" was not an asset of the bank, but it is averred that the described land which was by the accused declared in his false entry to be the "A. Barton Farm" and to be an asset of the bank was not such an asset. We cannot perceive any substantial difference between an averment that the described land was known as the Barton farm and was an asset of the bank and an averment that the Barton farm was known as the described land and was an asset of the bank. There can be no doubt the accused well knew with what he was charged. The fair meaning of the charge is that the Barton farm was known to be the same thing as the described

land, and that it, under that name or otherwise, was not an asset of the bank. This certainly would so appear to the common understanding, and that is sufficient.

. There is no specification found in defendant's brief of reasons why the third count does not state an offense, and we, after careful scrutiny of it, fail to find any.

The fourth count charges that the defendant, while acting as president of the bank, made another false entry in a report to the Comptroller of the Currency, showing the condition of the bank at the close of business on the 9th of June, 1904; that the false entry in that report was in the words and figures following: "Lawful Money Reserve in Bank, Specie viz.: Gold Coin, $23,955.00." The averment is then made that the false entry purported to show, and did, in substance and effect, show, that the sum of $23,955 in gold was in the actual possession of the bank at the close of business on the evening of June 9, 1904, as a part of its lawful money reserve. It is then averred that that entry was false in this: That on the 9th day of June, 1904, the bank had only the sum of $21,955.00 of gold coin as lawful money reserve. It is argued that this count fails to state a criminal offense for want of an allegation that the lawful reserve exceeded the sum of $21,955. This, in our opinion, is not a sound criticism. It is not an offense in purview of section 5209, and certainly not the offense charged in this indictment, for a national bank to have more or less gold on hand than that which equals the required reserve. The offense consists in making a false entry in a report. The Comptroller requires certain reports from national banks in order to show their true condition. As a matter of practice he indicates in blanks, furnished to the banks by him, what facts he wishes information about; and one of them is the amount of gold coin on hand constituting the lawful money reserve. His discretion and his subsequent action largely depend upon the truth of such reports and the facts disclosed thereby. Their falsity alone constitutes the gist of the offense.

It is next urged that the allegation that the entry was made in the report "with intent to deceive the Comptroller of the Currency and any agent who might be appointed to examine the affairs of the bank" was immaterial. That is quite correct so far as the allegation concerning the intent to deceive the Comptroller is concerned. Such intent is not one of those requisite under section 5209 to constitute an offense. But the contention is not correct in so far as the allegation relates to the intent to deceive an agent who might be appointed to examine the affairs of the bank. The act in terms contemplates the appointment of such agents as specifically provided for by section 5240, Rev. St. [U. S. Comp. St. 1901, p. 3516], and, although the report is made to the Comptroller, yet if the intent in making a false entry is to deceive an examiner who, every officer of a bank knows, may be appointed to make an examination for the information of the Comptroller, it is sufficient by itself to constitute an offense, irrespective of the existence of any of the other intents disjunctively mentioned in the act. United States v. Allis (C. C.) 73 Fed. 165;

McKnight v. United States, 38 C. C. A. 115, 97 Fed. 208. We think the fourth count sufficiently states a criminal offense.

The objection to the fifth count is the same as that made to the fourth, and needs no further consideration.

The sixth and seventh counts charge the defendant with having misapplied funds of the bank by drawing against them two drafts (one for $10,000 and the other for $8,250) in favor of one Rogers, with intent to injure and defraud the bank, and to convert the proceeds of the drafts to the use of Rogers and other persons to the grand jury unknown. The counts clearly state offenses, and it is so admitted by defendant's counsel in his brief. His only objection to the conviction under them relates to the sufficiency of the evidence to support them. The eighth and subsequent counts charge false entries and misapplication of funds in favor of the Minnesota Lumber Company. The objection to them is that their allegations lack the required degree of certainty. A careful examination convinces us that they are not obnoxious to that objection.

Does the proof sustain the conviction? We have carefully examined all the evidence bearing on the several counts on which the defendant was found guilty, and unhesitatingly conclude that the verdict on each and all of them is well sustained by the proof adduced; but, in view of the rule applicable to this case, already adverted to, we shall, for the purposes of this opinion, confine our treatment of the evidence to that bearing on the sixth and seventh counts only. These counts charge the misapplication of $10,000 and $8,250, respectively, by the process of defendant's drawing drafts on depositories of his bank in favor of A. C. Rogers, and thereby permitting him and others to appropriate those sums of money to their own purposes, without any consideration moving to the bank therefor. The evidence tending to support the verdict on these counts is substantially as follows: The De Soto Fruit, Agricultural & Manufacturing Company was a corporation organized and existing under the laws of the state of Georgia. It does not appear what its capital was, but it does appear that only 93 shares, of the par value of $100 per share, had been issued. Clement personally owned 90 of these shares. Conceding them to have been paid in full, as to which there is no evidence, the company had only $9,300 of capital. It authorized an issue of bonds aggregating $100,000, secured by deed of trust conveying to trustees "all and singular its real and personal property in said state"; but what that real and personal property consisted of does not appear. The bonds were issued and delivered to the Royal Trust Company of Chicago, it being one of the trustees named in the deed of trust required to certify something (probably that the title to the real estate conveyed was clear, but this does not distinctly appear), and to deliver the bonds upon the order of A. C. Rogers, who was the president of the De Soto Company. Rogers does not appear to have owned any stock of the De Soto Company, and could not possibly have owned over three shares, as the balance belonged to Clement. He gave Clement an order in writing upon the trust company, requesting it to certify and deliver all the bonds to him. This the trust company

declined to do until a certain incumbrance, amounting to $18,250, upon the real estate of the De Soto Company should be extinguished. Thereupon Clement, acting as president of the Faribault bank, drew the two drafts mentioned in the fifth and sixth counts of the indictment, aggregating $18,250, upon its correspondents in New York and Chicago, which had funds of his bank sufficient to meet them. The drafts were payable to the order of Rogers, who had no money or funds to his credit in the Faribault bank. Neither he nor Clement nor any one else paid the bank anything for the drafts. Rogers at the request of Clement took the drafts to Cincinnati, and with them, or their proceeds, extinguished the incumbrance held by a trust company located there. Thereafter the Royal Trust Company certified and delivered the entire issue of $100,000 bonds to Clement, on the order which he had formerly secured from Rogers. No record or entry of any kind was made in the books of the bank concerning the drawing of the drafts, except what appeared on the stub of the draft book, until 10 days after they were drawn; when on January 30, 1904, Clement "caused to be entered on the books of the bank as its assets $30,000 face value of the bonds of the De Soto Company, and as an offset against the same charged the bank with the said sum of $18,-250." The evidence does not show that Clement ever in fact delivered any such bonds to the bank, unless that fact may be implied from the quotation just made. It may, however, be assumed for the present purposes that it was done.

The following further facts appear by the proof: The balance of the issue of bonds by the De Soto Company, $70,000 in face value, were on February 20, 1904, delivered by defendant to the bank to balance its account occasioned by Clement's discounting for the benefit of the Minnesota Lumber Company certain drafts claimed by the government, and found by the jury in its verdict on other counts to be bogus, amounting to $68,270. The bank failed, and was taken in charge by a receiver appointed by the Comptroller on January 3, 1905. Its funds were actually depleted by the payment of the two drafts in question in the full amount of their face value, namely, $18,250.

Rogers appears from the foregoing to have been only a tool of Clement, financially irresponsible, but willing to do his bidding. The aspect of this case most favorable to the defendant is that he, without authority from his board of directors or other officers, used about $100,000, including the $18,250 involved in counts 6 and 7 of the indictment, of the money of his bank, either for his own benefit or that of his friends, and after doing it undertook to thinly disguise his wrongful purpose by delivering to his bank, unsolicited, and, so far as this record shows, undesired by it, $100,000 in face value of bonds of a corporation organized in Georgia, with a capital of $9,300 only, all of which was probably invested in lands of unknown and doubtful value. The value of these bonds, even if delivered by Clement to his bank for the purpose of satisfying its claim against him for moneys taken by him, amounted to nothing in fact. The proof shows that the funds of the bank were by reason of the two drafts in question actually depleted to the full extent of the face value of the drafts.

We are seriously asked to say that this evidence, taken in connection with all reasonable inferences deducible from it, and taken in connection with the fact disclosed by the judgment below that Clement was engaged at or about the same time in similar transactions involving false entries and misapplications of other funds of the bank, does not support the verdict of guilty rendered on the fifth and sixth counts; that it might be evidence of bad judgment or maladministration of a trust, but no further. To this we cannot consent. In our opinion the evidence discloses a corrupt purpose on the part of Clement to willfully misapply the funds of the bank, and great success in accomplishing his purpose. It is altogether sufficient, not only to justify the conviction on the counts under consideration, but to imperatively require it. The offense of misapplication denounced by section 5209 of the Revised Statutes consists "in the conversion to his own use or to the use of some one else of the moneys and funds of the bank by the party charged." United States v. Briton, 107 U. S. 655, 666, 2 Sup. Ct. 512, 27 L. Ed. 520. If the facts of this case do not respond to the definition of the crime just given, we are unable to conceive of those that would.

Some other questions require consideration. The government at the outset of the case produced proof showing the original incorporation and organization in 1868 of the First National Bank of Faribault under the provisions of the act of June 3, 1864 (chapter 106, 13 Stat. 99), and later offered the original certificate, signed by the deputy and acting comptroller with the seal of the Comptroller impressed upon it, certifying to the extension of its corporate existence under the provisions of the act of July 12, 1882 (chapter 290, 22 Stat. 162 [U. S. Comp. St. 1901, p. 3457]), until November 21, 1908. This was objected to for several reasons: First. Because no preliminary showing was made of the consent of the requisite number of stockholders to the extension, or of other prerequisite facts found in section 2 of the act of 1882. This objection was without merit. The certificate of the Comptroller was to the effect that the bank had complied with all the provisions of the act of July 12, 1882, to enable it to extend its corporate existence, and in terms it certified that the bank was authorized to have succession until November 21, 1908. Such a certificate, under powers conferred upon the Comptroller of the Currency by the act of 1882, is conclusive evidence, in a case like this, of compliance by the bank with all necessary prerequisite conditions. Casey v. Galli, 94 U. S. 673, 24 L. Ed. 168, 307.

An objection to the introduction of the certificate was also made because it was not shown to have been physically accepted or received by the bank. The bank continued its existence, performing the functions of a national bank, after the expiration of its original corporate existence. It will be presumed to have accepted the benefit conferred by the certificate in its favor, and to have acted under the authority of the only instrument which entitled it to act at all.

It was also objected, that the certificate was signed by the deputy and acting comptroller and not by the Comptroller himself. That is immaterial. Keyser v. Hitz, 133 U. S. 138, 10 Sup. Ct. 290, 33 L. Ed. 531. It was also objected that there was no proof of the authenticity

of the certificate. The seal of the Comptroller was impressed upon it, and we take judicial knowledge of what that seal is. It is in daily use, authenticating many of the most important financial transactions of the executive department of our government. See Pierce v. Indseth, 106 U. S. 546, 549, 1 Sup. Ct. 418, 27 L. Ed. 254, for analogous case. Moreover, the regular and constant enforcement of the laws providing for supervision by the Comptroller over national banks, the frequent reports from and examinations of such banks, and the proof of the actual performance by the Faribault bank of the functions of a national bank for 15 years or more after the certificate of extension was given, afford full recognition of the authenticity of the certificate in question. There was no error in overruling any or all of the objections to the introduction of the certificate.

Error is assigned of certain rulings on evidence, refusal by the District Court to charge the jury as requested, and to portions of the charge as made. To these we have given that diligent and careful attention required by the gravity of this case, and, in view of the rule that a lawful judgment and sentence pronounced without error on any one count requires the affirmance of the judgment even if error was committed in respect of other counts, we refrain from the unprofitable detail necessarily involved in discussing the challenged rulings on the materiality and competency of evidence, the exceptions to instructions refused, and to the charge as given by the court. It is sufficient to say that in our opinion the conviction on the second, third, sixth, and seventh counts was unaffected by any possible irrelevant or incompetent testimony challenged by defendant's counsel; that as to them no prejudicial error was committed by the court in refusing to instruct in the language as requested or in the charge as given. The charge as a whole was fully as favorable to the defendant as the case warranted, and presented every proper and lawful consideration conducing to his acquittal. We are impressed by the record as a whole that he was given a fair and impartial trial, and that his guilt was established beyond any reasonable doubt. The judgment should therefore be affirmed, and it is so ordered.

SANBORN, Circuit Judge (concurring). In my opinion there was no evidence to sustain the verdict on the second count of the indictment, there was fatal error in the charge of the court relative to the trial of the third count, and I am unable to assent to the view that the defendant was lawfully convicted upon any count in the indictment except the sixth and seventh. I concur in the judgment of affirmance upon the sole ground that there was substantial evidence in support of the verdict of guilty on these two counts, and that the record fails to disclose any material error in the trial of the charges they set forth.