### WISCONSIN CENT. RY. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. March 15, 1909.)

#### No. 2,710.

1. CARRIERS (§ 38*)—DISCRIMINATION—REBATING—INDICTMENT.

A grain company made certain shipments of grain over defendant's road from Minneapolis to Milwaukee to the grain company's brokers, who received the consignments, paid the freight, and afterwards sold the grain for the shipper's account. Thereafter the grain company presented to defendant the receipted freight bills paid by the consignees with other papers, on which defendant, according to a pre-existing agreement, refunded elevator charges to the grain company. Held, that defendant at the time it paid such rebate had actual knowledge that the freight had been paid by the consignees acting for the grain company, and that such facts therefore sustained an indictment charging the railroad company with paying a rebate to the grain company from freight charges before then "received from the grain company."

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 38.*]

2. CARRIERS (§ 32*)—INTERSTATE COMMERCE—REGULATION—DISCRIMINATION—REBATES.

Where an interstate carrier returned to a shipper of grain after payment of the freight an amount equal to elevator charges at the point of

---

shipment, and the carrier had not published or filed any schedule showing that it had absorbed such elevation charge as a part of its rate between the points in question, the carrier was guilty of granting rebates prohibited by Elkins Act, § 1 (Act Cong. Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]).

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 32.*]

3. CRIMINAL LAW (§ 1177*)—APPEAL—PUNISHMENT—PREJUDICE.

Where the judgment did not exceed that which might have been pronounced on any one of the counts of the indictment, it would not be disturbed if warranted by any count, however unwarranted it might have been on the others.

[Ed. Note.—For other cases, see Criminal Law, Dec. Dig. § 1177.*]

In Error to the District Court of the United States for the District of Minnesota.

See, also, 151 Fed. 84.

Walter D. Corrigan (Thomas H. Gill, on the brief), for plaintiffs in error.

Paul A. Ewert (Charles C. Houpt, on the brief), for the United States.

Before HOOK and ADAMS, Circuit Judges, and AMIDON, District Judge.

ADAMS, Circuit Judge. The railway company and its general and assistant general freight agents were indicted for granting rebates to the Spencer Grain Company in violation of section 1 of the act of February 19, 1903 (chapter 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1907, p. 880]), known as the "Elkins Act." Each of the 17 counts of the indictment charged the shipment of grain by the grain company over defendant's line from Minneapolis to Milwaukee, the payment of freight charges according to the legal rate, 7½ cents per 100 pounds, as published and filed in defendant's tariffs and schedules then in force, and the subsequent refunding by defendants to the grain company of ½ cent per bushel on the grain shipped. The defendants were found guilty and bring the case here by writ of error for re-examination.

It is uncontroverted: That the railway company was a common carrier engaged in the transportation of property in interstate commerce; that it received the shipments of grain for transportation as charged; that it accepted the legal freight rates and charges therefor as set forth in its tariffs and schedules; that it subsequently paid the grain company one-half cent per bushel on all the grain shipped.

The contentions of fact are that there was no refunding of freight charges by the railway company to the shipper, but, on the contrary, that there was a proper and lawful payment for services performed or expenditures incurred in the elevation of the grain from the cars of railroad companies arriving from western grain fields into elevators in Minneapolis and the subsequent reloading of that grain into cars of the defendant railway company going east. It is admitted that the railway company paid the elevation charges, but it is claimed that it did so pursuant to a custom which had prevailed in Minneapolis whereby elevation charges for actual service performed by the elevators in

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

handling grain originating west of the Mississippi river were absorbed in the freight charges. It is also admitted that pursuant to this custom the grain in question was transferred either out of cars bringing it in from the west directly through the elevator or out of the elevator where it may have been stored for a time into the cars of the defendant railway company for transportation. There is no pretense that the railway company had published or filed any schedule showing that it had absorbed the elevation charge as a part of its rate from Minneapolis to Milwaukee. As to that service the schedule was silent.

The foregoing facts bring this case broadly within the principles announced by us in Railway Company and Pearce v. United States, 84 C. C. A. 93, 155 Fed. 945. Owing to the fact that the opinion in that case had not been published before the argument was prepared in this case, many of the questions there decided were again debated by counsel; but, as we discover no reason for departing from the conclusions then reached, we do not deem it necessary to restate them here. We held in that case that the absorption of a charge for elevation service required at the end of the defendant's line of railroad in order to make a delivery to a connecting carrier for further transportation was not, in the absence of a schedule showing the absorption, justifiable, and approved of the submission to the jury of the issue whether the transaction as actually conducted had the effect of reducing the cost of transportation below the scheduled rates, and whether the defendants intended that such an effect should follow as a result of what they did. There is no difference in principle between that case and this. The elevation charge absorbed in that was for services rendered at the end of the transportation, while that absorbed in this case was for services rendered at the beginning of the transportation. Accordingly we refrain from discussing the many questions there discussed and decided which are now again presented to us and reaffirm the principles then announced.

There are, however, some questions peculiarly applicable to this case, to which we will briefly refer. There is abundant evidence that the consignees were the agents or brokers of the Spencer Grain Company, that they received the consignments of grain, paid the freight thereon to the railway company, and afterwards sold the grain for account of the grain company; but it is said that there is no evidence that the defendant railway company or its officers had any knowledge of these facts and particularly had any knowledge of the fact that the consignees paid the freight for account of the grain company. This issue becomes important, for, unless the railway company was aware of the last-mentioned fact, it could not have intentionally paid to the Spencer Grain Company the sum of one-half cent per bushel which it did pay, as a rebate from freight charges before then received from the grain company, as charged in the indictment. After a careful consideration of the proof on this point we entertain no doubt that the railway company actually knew before it paid the agreed one-half cent per bushel to the grain company that the freight had been paid by the consignees at Milwaukee acting for the latter company; in other words, that the freight had actually been paid by the grain company. Papers were

presented to the railway company by the grain company as vouchers to secure the refunding of the elevation charge which contained, among other things, the receipted freight bills paid by the consignees in Milwaukee. Proof of this kind, taken in connection with the pre-existing agreement between the railway company and the grain company for the refunding of elevation charges on shipments made by the latter company over its line, is certainly sufficient evidence to go to the jury to show that the railway company knew that payment of freight bills on shipments made by it to its consignees were made for its account.

Some significance is attached to the name given to the rate of 7½ cents per 100 pounds on shipments to Milwaukee and Chicago. It was called in the tariff schedules "proportional freight tariff on grain and flax seed when originating west of the Mississippi river." The proof shows that there was no joint tariff or arrangement of any kind existing between the railway company and any other connecting carriers operating west of Minneapolis. In such circumstances we fail to discern any advantage to the railway company by the use of that inaccurate designation of its tariff.

Whatever position the railway company through its counsel may have taken at the trial of this cause, the important and material facts of the case were frankly disclosed by the general freight agent of the railway company while testifying as a witness. He said:

"We got grain—when we solicited grain, it was on the assumption, even if it was not directly expressed to the shipper, that we would assume any disability that was against us—against the shipper."

And when asked what he meant by "disability," he said:

"Disability in the way of terminal charges of any kind—where we could not place our road upon a parity with other roads. If we had not been able to do that, the shipper would not give us the business."

Again he was asked the question:

"Will you state for what purpose you put in or authorized to put in the assumption of elevation charges upon grain shipments from Minneapolis?"

And to this question he made this answer:

"To equalize our physical disadvantage here in securing business."

This frank admission closely assimilates the present case in its most substantial features to that of the Railway Company and Pearce v. United States. We there said:

"There is evidence tending to show that the sole purpose and object of absorbing the cost of elevation by the railway company was to enable it to get its fair share of the initial transportation of grain destined for Lake Erie ports. * * * In our opinion, the fact that other railroads competing for the over the lakes business absorbed the elevation charge, and that it was necessary for the defendant company to do so to secure participation in that business cannot alter the legal effect of what was done. We suppose the main reason which in times past moved railroad companies to make rebates or concessions in individual cases was to secure business for their lines, and that the spirit of competition in the race for business brought about the practice of so granting rebates and concessions. This practice, we understand, was the vice aimed at in the recent legislation which has for its main object the equalization of rates between given points for the same service."

These observations are entirely apposite to the case now before us and require no amplification.

There are in this case 67 assignments of error. They present in many and different ways the questions presented and disposed of in the Railway Company and Pearce Case. They therefore require no further attention at our hands at the present time.

. The learned trial judge fairly submitted to the jury several issues of fact leading up to the final issue, and then left it to the jury to say whether the payment by the railway company of the one-half cent per bushel to the grain company had the effect of causing the grain in question to be transported from Minneapolis to Milwaukee at a less rate than that shown in the published and filed tariffs, and whether the railway company paid that sum of money to the grain company knowing and intending that it would and should have that effect. This charge fairly submitted to the jury the substantial and controverted issue of fact in the case. The verdict against the defendants on this issue is supported by abundance of direct testimony as well as by inferences deducible from established facts consistent, in our opinion, with the conclusion reached.

Considerable attention is given in the argument and brief of the railway company to counts 4, 5, 6, 7, 8, and 9 of the indictment, known as the "Commons & Co. counts." It is claimed that the grain which is the subject of those counts was billed out in the name of Commons & Co. without any knowledge on the part of the railway company or its officers of the interest of the Spencer Grain Company in the shipments. This issue was fairly submitted to the jury and found by them against the defendants, and we think there was ample evidence to support their finding.

However this may be, there was a general verdict of guilty on all of the 17 counts of the indictment, and only one judgment was pronounced against the defendants. As this judgment did not exceed that which might have been pronounced on any one of the counts, it should not be disturbed if warranted on any count, however unwarranted it might have been on others. Claassen v. United States, 142 U. S. 140, 12 Sup. Ct. 169, 35 L. Ed. 966, and Clement v. United States, 79 C. C. A. 243, 149 Fed. 305, 312 and cases cited.

In view of the conclusions reached in the former case, it would be useless to take up seriatim the many questions presented by the assignment of errors in this case. Their solution is necessarily involved in the conclusions then reached and now reaffirmed. We have, however, considered them sufficiently to satisfy us that no prejudicial error was committed against the defendants.

The judgment is affirmed.