SMITH et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 12, 1907.)

(No. 2,522.)

1. CONSPIRACY—CONSPIRACY TO DEPRIVE CITIZEN OF LIBERTY—PEONAGE.

The right to freedom from slavery or involuntary servitude, except as a punishment for crime, is one secured to every person within the jurisdiction of the United States by the thirteenth constitutional amendment; and a conspiracy to deprive any citizen of such right is indictable under Rev. St. § 5508 [U. S. Comp. St. 1901, p. 3712], which makes it a criminal offense "to conspire to injure, oppress, threaten or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States."

2. INDICTMENT—SUFFICIENCY OF AVERMENTS—DESCRIPTION OF OFFENSE.

Averments in an indictment of the essential elements of the offense, which are plain and intelligible to the common understanding, and stated with such particularity as to enable the accused to understand the nature of the charge, to intelligently prepare to meet it, and to plead the result as a protection against another prosecution for the same offense, are sufficient as against a demurrer without regard to their technical accuracy.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, §§ 174–182.]

3. CONSPIRACY—INDICTMENT—FEDERAL STATUTE.

In an indictment under Rev. St. § 5508 [U. S. Comp. St. 1901, p. 3712], for conspiracy to deprive a citizen of a right secured to him by the Constitution or laws of the United States, it is not necessary to aver any overt act and any averment in such an indictment of acts done must necessarily be referred to the charge of conspiracy as describing or particularizing such charge.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, § 89.]

4. SAME.

An indictment which charges the accused in the language of Rev. St. § 5508 [U. S. Comp. St. 1901, p. 3712], with having conspired to injure, oppress, threaten, and intimidate a citizen named in the free exercise of a right secured to him by the Constitution and laws of the United States, and which by way of further particularizing avers that such right was the right to the free exercise and enjoyment of freedom from involuntary servitude and slavery, and that the conspiracy was to be effected by arresting, imprisoning, guarding, and compelling him by threats and intimidation to work and labor against his will for the defendants, sufficiently describes the offense, and need not exclude the defendants from the operation of the exception in the thirteenth constitutional amendment by an averment that such person was not held in servitude as a punishment for crime.

5. SAME—EVIDENCE TO ESTABLISH—ACTS OF DEFENDANTS.

A conspiracy to commit a crime may be and usually must be from the nature of the case proved by inference from the acts of the parties and their co-operation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Conspiracy, §§ 105–107.]

6. SAME—TRIAL FOR CRIMINAL CONSPIRACY—SUFFICIENCY OF EVIDENCE.

On the trial of defendants charged with conspiracy to deprive a person named of his rights under the Constitution and laws of the United States by subjecting him to involuntary servitude, there was evidence that one of the defendants went to Memphis, Tenn., and there hired 15 or more negroes to go with him to his place in Missouri to work in a mill, promising liberal wages. On their arrival in the night, they were met at the

157 F.—46

station by another of the defendants with hacks and taken to a farm 12 miles distant, where they were searched for weapons, and then placed in a cabin under the guard of others of the defendants, armed with repeating rifles and revolvers. They were kept under such guards night and day and worked on the farm in clearing and ditching, were subjected to brutal punishments, and few, if any, received the promised wages. Some who succeeded in escaping were brought back by some of defendants armed with guns. Each of the defendants convicted participated in some way in such transactions, either as owner of the farm, overseer, or guards. *Held*, that such evidence was sufficient to warrant the submission of the case to the jury, and to support a finding of conspiracy as charged.

7. CRIMINAL LAW—INSTRUCTIONS.

Instructions given and refused on the trial of an indictment for conspiracy considered, and the court *held* not to have committed error; the instructions refused so far as correct having been substantially given in the court's charge.

8. CRIMINAL LAW—TRIAL—COMMENTS BY JUDGE ON EVIDENCE.

Comments by the judge as to the value of evidence are not assignable for error when the jury are left at full liberty to determine the issues of fact for themselves.

In Error to the District Court of the United States for the Southeastern Division, of the District of Missouri.

Chester H. Krum and Moses Whybark (W. H. Miller and Oliver & Oliver, on the brief), for plaintiffs in error.

Assistant Attorney General Russell (E. P. Johnson and Henry W. Blodgett, on the brief), for defendant in error.

Before VAN DEVANTER and ADAMS, Circuit Judges, and RINER, District Judge.

ADAMS, Circuit Judge. The plaintiffs in error, Charles M. Smith, Sr., Charles M. Smith, Jr., William Woods, Floyd Woods, Benjamin Field, Benjamin Stone, and W. Lee Rodgers, were jointly indicted with James E. Smith and Rex Smith in the court below in 44 counts for violating the provisions of section 5508 of the Revised Statutes [U. S. Comp St. 1901, p. 3712]. They were charged in each count with conspiring to injure, oppress, threaten, and intimidate a citizen of the United States in the free exercise and enjoyment of rights and privileges secured to him by the Constitution and laws of the United States. James E. and Rex Smith were found not guilty by direction of the court. The other defendants were found not guilty by like direction on 20 counts, and on all the remaining counts which were submitted to the jury, except the eleventh, they were found not guilty. On that they were found guilty. They were each sentenced to imprisonment for terms ranging from three years and six months to one year and six months and to pay a fine ranging from $5,000 to $100 and costs. The present writ of error challenges the judgment for errors alleged to have been committed at the trial.

Omitting formal parts, the eleventh count of the indictment is as follows:

"That on the 1st day of June, 1906, the defendants [naming them] did unlawfully and feloniously conspire, combine, confederate and agree together to injure, oppress, threaten and intimidate a certain citizen of the United States,

to wit, John Reed, in the free exercise and enjoyment of rights and privileges secured to him by the Constitution and laws of the United States, to wit, the right to the free exercise and enjoyment of freedom from involuntary servitude and slavery; that in pursuance of said unlawful and felonious conspiracy, combination, confederation, and agreement, and to effect the object thereof, the said defendants [naming them] did then and there unlawfully and feloniously arrest, hold, imprison, and guard him, the said John Reed, and then and there unlawfully and feloniously compel by threats and intimidation him, the said John Reed, to then and there work and labor involuntarily and against his will for said defendants [naming them], contrary to the form of the statute in such case made and provided, and against the peace and dignity of the United States."

A demurrer was first filed, challenging the legal sufficiency of the indictment on several grounds. Those specified and relied on in argument are: (1) The right to freedom from involuntary servitude and slavery against the free exercise of which the defendants are charged with conspiring is not a right secured to a citizen by the Constitution and laws of the United States, and therefore the offense as laid in the indictment is not within the contemplation of section 5508. (2) The charge of conspiracy as laid in the indictment is not complete in itself, and because it cannot be aided by acts charged to have been done in furtherance of it is insufficient. (3) The indictment merely follows the language of the statute when it should have individuated the offense. (4) The indictment is not sufficiently explicit to advise the accused of the nature of the charge against them or enable them intelligently to prepare to meet it. (5) The indictment fails to aver that the accused were not held in involuntary servitude as a punishment for crime. Of these in their order.

Is the right to freedom from involuntary servitude or slavery secured to a citizen by the Constitution? The right protected by section 5508 must undoubtedly be one which is secured by some provision of the Constitution or by some law of the United States. That section, so far as now pertinent, is as follows:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States * * * they shall be fined not more than five thousand dollars and imprisoned not more than ten years; and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

The government contends that the right protected by that section and charged to have been violated by the defendants is secured by the thirteenth amendment to the Constitution of the United States, which is as follows:

"Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

"Sec. 2. Congress shall have power to enforce this article by appropriate legislation."

Defendants' learned counsel first contend that the right to freedom from involuntary servitude and slavery is secured by no Constitution or law; but is inborn, given to man by his Creator, and recognized, under the name of liberty, in the Declaration of Independence as one of

his equal and inalienable rights. With most of this panegyric we are in full accord, but not with all. That a right may be inborn or natural in most cases merely expresses the fact that it is a right. Most, if not all, the rights of mankind which are recognized by law have their origin or suggestion in natural right, and it is because of the intuitive recognition of that right that they are so recognized and protected by law. The right to life and the pursuit of happiness is by the token invoked by learned counsel an endowment of the Creator, personal and inalienable. But the protection and security of these rights in one form or another furnishes the occasion of most of our legislation, federal and state. We cannot perceive how the preservation or security of a natural right may not afford the subject of legislation. One has a generally conceded and natural right to his life and property. If these rights may not be protected or secured by law, our Legislatures, national and state, have been for a long time woefully mistaken.

A complete answer to defendants' contention is afforded by the fact that the statute protects a right "secured" by the Constitution and laws; not one originating in, created, or granted by them. This discriminating use of words is significant, and in our opinion conclusive against defendants' contention. The Constitution ordains that neither slavery nor involuntary servitude shall exist within the United States, etc. Nothing can more effectually secure the right of freedom from slavery or involuntary servitude than this peremptory and all comprehensive prohibition against their existence anywhere within the jurisdiction of the United States. The Supreme Court in Clyatt v. United States, 197 U. S. 207, 216, 25 Sup. Ct. 429, 430, 49 L. Ed. 726, speaking by Mr. Justice Brewer concerning the amendment in question, said:

"This amendment denounces a status or condition, irrespective of the manner or authority by which it is created. * * * It names no party or authority, but simply forbids slavery and involuntary servitude, grants to Congress power to enforce this prohibition by appropriate legislation."

Mr. Justice Bradley in Civil Rights Cases, 109 U. S. 3, 20, 23, 3 Sup. Ct. 18, 28, 27 L. Ed. 835, observes concerning this amendment that it "is undoubtedly self-executing without any ancillary legislation, so far as its terms are applicable to any existing state of circumstances. By its own unaided force and effect it abolished slavery, and established universal freedom. * * * The amendment is not a mere prohibition of state laws establishing or upholding slavery, but an absolute declaration that slavery or involuntary servitude shall not exist in any part of the United States." In Hodges v. United States, 203 U. S. 1, 16, 27 Sup. Ct. 6, 8, 51 L. Ed. 65, Mr. Justice Brewer, again speaking of this amendment, says:

"The meaning of this is as clear as language can make it. The things denounced are slavery and involuntary servitude, and Congress is given power to enforce that denunciation. All understand by these terms a condition of enforced compulsory service of one to another. * * * If in any respect it commits one race to the Nation, it commits every race and every individual thereof."

There can be no doubt that section 5508 is an exercise of the legislative function warranted by section 2 of the thirteenth amendment. It was enacted in view of that amendment and the right undertaken to

be protected by it is undoubtedly a right secured by the amendment.

The cases cited by learned counsel in support of their view (Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274; United States v. Waddell, 112 U. S. 76, 5 Sup. 35, 28 L. Ed. 673; Logan v. United States, 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429; In re Quarles and Butler, 158 U. S. 532, 15 Sup. Ct. 959, 39 L. Ed. 1080) relate generally to conspiracies to injure or intimidate a citizen in the exercise of some conventional right actually created or conferred by the Constitution or by some law as distinguished from a natural right, and therefore do not make against our conclusion in this case. A right which has been conferred by law is manifestly secured by that law. Such concession, however, is no authority for the contention that a right secured by law must necessarily have been conferred by some law.

The second, third, and fourth grounds of demurrer may properly be considered together. Is the charge of conspiracy as laid in the indictment sufficiently specific? A fundamental and well-established rule necessary to be observed in all cases is that all the essential elements of the offense must be averred in the indictment, and that, too, with sufficient clearness and particularity to enable the accused to understand the nature of the charge against him, to intelligently prepare to meet it, and to plead the result, whether conviction or acquittal, as his protection against another prosecution for the same offense. The degree of particularity requisite to fairly accomplish these purposes is all that is required in any case. No useless or impracticable standards which may embarrass rather than aid the administration of justice should be required. Averments of the essential elements just suggested which are plain and intelligible to the common understanding are, as against a demurrer, entirely sufficient without regard to their technical accuracy. Brown v. United States, 74 C. C. A. 214, 143 Fed. 60; Clement v. United States, 79 C. C. A. 243, 149 Fed. 305; Rinker v. United States, 151 Fed. 755, 81 C. C. A. 379; Stearns v. United States, 152 Fed. 900, 82 C. C. A. 48. How does the present indictment respond to the foregoing rule? The indictment for conspiracy under section 5508 is different from one under section 5440. In the latter an overt act must be pleaded, while in the former none is required. We therefore find no occasion in this case for application of the rule laid down in United States v. Britton, 108 U. S. 199, 205, 2 Sup. Ct. 531, 27 L. Ed. 698, that a charge of conspiracy cannot be aided by averments of acts done in furtherance of it. Whatever the actual fact be, in contemplation of law there are no such averments in this indictment. Certain acts are charged to have been performed in furtherance of the conspiracy. These must necessarily be referred to the charge of conspiracy, which is the subject of the indictment, for their legitimate scope and operation. Even in indictments under section 5440 reference may be made to averment of overt acts, not to supply any omitted elements of the crime, but for the purpose of elucidating the meaning of terms employed in charging the crime. Stearns v. United States, supra, and cases cited. Much more is this true in an indictment under section 5508, wherein no overt act is required to be averred. All the averments of such an indictment may

be taken into account in relieving essential averments actually made of possible doubt and uncertainty. "The entire indictment is to be considered in determining whether the offense is fully stated." Dunbar v. United States, 156 U. S. 185, 190, 15 Sup. Ct. 325, 39 L. Ed. 390.

It is objected that the offense is charged only in the language of the statute, and that such language fails to set forth all the elements of the crime, within the meaning of the rule announced in Potter v. United States, 155 U. S. 438, 444, 15 Sup. Ct. 144, 146, 39 L. Ed. 214, where it is said:

"While it is doubtless true that it is not always sufficient to use simply the language of the statute in describing such an offense (United States v. Carll, 105 U. S. 611, 26 L. Ed. 1135), yet if such language is, according to the natural import of the words, fully descriptive of the offense, then ordinarily it is sufficient."

Let us now examine the indictment. It is charged that the defendants conspired "to injure, oppress, threaten, and intimidate a citizen." These words have a familiar meaning, and needed no explanation in the indictment. The citizen to be injured also was specified. It was John Reed. In what respect he was to be injured was specified, "in the free exercise of a right secured to him by the Constitution and laws of the United States," and that right was particularized by the additional statement that it was "the right to the free exercise and enjoyment of freedom from involuntary servitude and slavery." The meaning of the words, "involuntary servitude and slavery," are not open to doubt. No language could make it clearer. Mr. Justice Brewer, speaking of them in Hodges v. United States, supra, says:

"All understand by these terms a condition of enforced compulsory service of one to another."

But it is further objected that the indictment does not disclose how or in what respect John Reed was to be injured or intimidated. This objection is without merit. The indictment in words not to be mistaken charges that he was to be injured and intimidated by subjecting him to involuntary servitude; and then by way of particularizing it is alleged that the conspiracy to that end was to be effected by arresting, imprisoning, guarding, and compelling him by threats and intimidation to work and labor against his will for the defendants. This in our opinion fills the full measure of particularity required in an indictment for conspiracy under section 5508. All the elements of the offense are stated with that degree of certainty which, within the meaning of the rule above stated, fully acquainted the accused with the nature and cause of the accusation against them, enabled them to intelligently prepare to meet it and subsequently to plead the judgment in the case as their protection against another charge of the same kind.

It is further objected that the indictment was insufficient because it did not exclude the accused from the operation of the exception found in the thirteenth amendment. It is said that the failure to aver that John Reed was not to be subjected to involuntary servitude as a punishment for a crime is fatal to the indictment. This also is untenable. The ingredients of the offense were susceptible of accurate and clear

description without regard to the exception; and they were so described. We cannot conceive of an unlawful and felonious conspiracy to deprive a convict sentenced to hard labor in the penitentiary of his constitutional right of freedom from involuntary servitude. The exception in question is defensive in its character, and, if the defendants fell within its protection, it was an easy matter for them to show it, and it was their duty to do so. United States v. Cook, 17 Wall. 168, 174, 21 L. Ed. 538; Maxwell Land Grant Co. v. Dawson, 151 U. S. 586, 604, 14 Sup. Ct. 458, 38 L. Ed. 279; Shelp v. United States, 26 C. C. A. 570, 81 Fed. 694; Sims v. United States, 58 C. C. A. 92, 121 Fed. 515, 519; Schlemmer v. Buffalo, Rochester, etc., Ry., 205 U. S. 1, 10, 27 Sup. Ct. 407, 51 L. Ed. 681. From any point of view the indictment in our opinion was sufficient.

Before considering the remaining assignments of error, a brief statement of the main features of the case is necessary. The defendant Charles M. Smith, Sr., and his two brothers, James and Rex Smith, were the owners of large tracts of land in southeast Missouri, the clearing and cultivation of which were important matters to them. Defendant Charles M. Smith, Jr., was the son of Charles M. Smith, Sr. Defendants William Woods and W. Lee Rodgers were in charge under the Smith brothers of the work on two separate portions of the land, situated about a mile or so apart. The other defendants, Floyd Woods, Benjamin Field, and Benjamin Stone, co-operated with them in the way presently to appear. The voluminous evidence presented in the record before us tends strongly to show the following facts: That it was difficult to secure and keep laborers to do the necessary work of clearing and cultivating Smith's land; that in the early spring of 1906 Charles Smith, Jr., went to Memphis, Tenn., and secured 15 or more negroes, among whom was John Reed, the citizen named in the eleventh count of the indictment, whom he induced by promises of liberal wages to go with him to Sikeston, Mo., to work, as he represented to them, in a flour mill; that he transported them by railroad from Memphis to Sikeston in the night, arriving there at 1 or 2 o'clock in the morning; that on arrival there hacks were awaiting them into which the negroes were immediately loaded in gangs of five each; that they were thereupon driven in charge of defendant Charles M. Smith, Sr., who accompanied them a distance of about 12 miles to what is known as the "Woods' Place," where they were delivered over to the custody of William Woods, Floyd Woods, Benjamin Field, and Benjamin Stone, called in the evidence the "overseer" and "night" and "day" guards, respectively; that they were first searched for concealed weapons, which, when found, were taken from them; that they were then (it still being dark) put into a roughly built, filthy cabin called in the evidence a "shack," where bunks were provided for them; that the windows of this shack were cross-barred by heavy two-by-four pieces of timber, and these were covered over with barbed wire; that guards with six-shooters and repeating rifles were stationed over them at night while in the shack to prevent possible escape and by day while out of the shack to make them work and prevent escape; that the most cruel and brutal punishment was inflicted upon them for pretended infraction of rules, but more often for the purpose of forcing

them to the last extremity of possible service; that they were kept at work constantly, except Sundays, always under guard, in digging ditches, rolling logs, and doing other necessary work on the place; that on Sundays they were kept confined in their shack under guard; that few, if any, of them received the promised wages; that some from time to time made their escape at the risk of their lives. The treatment of these negroes had its counterparts at other times and in other places on the Smith farms; and these afford much corroborative evidence of the unlawful intent with which the gang of negroes in question was restrained. From all the evidence, which we have carefully examined, there can be no doubt of the main facts briefly epitomized above. The jury by their verdict have put the stamp of verity upon them. That such flagrant violation of law, such shameless inhumanity and brutality, such base dishonor to American citizenship could be deliberately practiced in a civilized and Christian community by intelligent men is a reproach to our civilization, and challenges instant and vigorous protest and action by all right-minded men.

It was first argued that the proof does not show that the service of the negroes was involuntary; but does show that none of them refused to work or demanded to be relieved from restraint, and that for this reason the court should have instructed a verdict of not guilty. This is unreasonable and absurd. In the nature of things resistance would have availed them nothing. Repeating rifles, revolvers, and clubs in the hands of brutish men determined to accomplish their purpose naturally suggested to their victims that prudence was the better part of valor. This was a proper matter for the consideration of the jury and its finding is conclusive. Again, it is said that the evidence of a conspiracy to deprive the negroes of their right, which is the offense denounced by section 5508, is entirely wanting. True, there is no direct evidence of the conspiracy. If that were necessary, it rarely, if ever, could be proved. Conspirators do not work in the light. They prefer darkness literally and figuratively. They frequently obscure their purpose by formal and technically correct instruments of writing, leaving their real purpose for execution, notwithstanding the writing. The effects and results of a conspiracy can be observed and proved, but rarely can one get a glimpse or make proof of the secret conferences which inaugurate it. For these manifest reasons proof of a criminal combination to do an unlawful act can rarely be made except by light reflected from its consequences or results.

We had occasion recently in the cases of Thomas and Taggart v. United States (just decided) 156 Fed. 897, to consider the question now before us. We there said:

"A preconcerted plan to do an unlawful act must from the nature of the case be usually established by inferences drawn from the relation of the parties from the acts done and from the results achieved."

Authority is ample for that proposition. State v. Ripley, 31 Me. 386; Commonwealth v. McClean, 2 Pars. Eq. Cas. (Pa.) 367; Davis v. United States, 46 C. C. A. 619, 107 Fed. 753; United States v. Babcock, 3 Dill. 581, Fed. Cas. No. 14,487. In State v. Ripley, supra, it is said:

"It is often that the intentions of a wrongdoer are ascertained entirely by acts done which are the natural effects of unlawful designs. The acts and circumstances which accompany them, showing the connection between the acts, and the motives which produced them, are generally the most convincing evidence which can be adduced."

In Commonwealth v. McClean, supra, it is said:

"In the history of criminal administration, the case is rarely found in which direct and positive evidence of criminal combination exists. * * * It is from the circumstances attending a criminal, or a series of criminal acts, that we are able to become satisfied that they have been the results not merely of individual, but of concerted and associated action."

The inevitable inference deducible from the co-operation and achievements of the defendants in this case is that they were the result of preconcert and design on their part. One goes to Memphis and induces the negroes by false representations to go to Sikeston; another has hacks in readiness on the arrival there to take them to Smith's farm, 12 miles away; others are prepared on arrival at the latter place to immediately imprison them; others are found there equipped with suitable weapons to effectually guard them by day to prevent escape, and extract the last modicum of work from them, while others are in readiness to guard them by night in a prison house obviously prepared beforehand for their detention. By the co-operation of all these men John Reed and other negroes were made to perform work for them against their will, and practically without compensation. This unlawful result could not, in our opinion, have been accomplished without preconcert or criminal combination on the part of the men engaged in it. There was ample evidence to support the charge of criminal conspiracy.

The claim that there was no evidence connecting defendants Smith, Sr., Stone or Rodgers with the conspiracy charged in the indictment is not sustained by the facts. Smith, Sr., as already observed, arranged for transporting the men from Sikeston to the farm, and accompanied them there himself. He went there on Sundays, and must have seen and approved of the treatment to which they were openly subjected. Whatever payments were made to the men he made, and they were engaged in clearing and draining his land. On being informed that trouble was likely to ensue by reason of Rodgers holding men against their will, he made the reply:

"Oh! there is no danger of that. If a man gets anything out of a nigger, I think he deserves it."

Stone acted as night guard, aided in the return of a fugitive negro, and in other ways appears to have been serviceable in accomplishing the unlawful purpose.

Rodgers was general overseer, or "lessee," as he was called, in control of one of the Smith farms where negroes were restrained. He assisted, with gun in hand, in the forcible return of a fugitive negro who sought to make his escape. He informed one of the negroes who was complaining about not getting his wages that it was useless for him to try and get away, as they had the roads watched for 20 miles, and would bring him back. He told one of the complaining negroes

that the United States were backing him up, at the same time displaying a star with the words "United States" on it, as evidence of his authority over them. He told them that $13,000,000 in Sikeston was backing him up. It is true that some of this evidence related directly to negroes held under restraint by Rodgers at his place, and not at Woods' place, which was a mile and a quarter away. But the proof well warrants the inference that the defendants, and all of them, whether operating at the Rodgers or Woods place were engaged in one and the same unlawful project or conspiracy to entice negroes to one place or the other with a view of subjecting them to involuntary servitude. Further reference to the proof would be futile. After a patient examination of it all, we are not only satisfied that there was substantial evidence against each and all of the complaining defendants to warrant the verdict as rendered, but that any other verdict would have been a travesty on justice.

This brings us to a consideration of errors alleged to have been committed by the trial court in refusing to give to the jury instructions requested by defendants. It is said the court erred in not giving the following instruction:

"The court charges the jury that each of the defendants is presumed to be innocent until the contrary has been shown beyond a reasonable doubt; that this presumption attends and surrounds each defendant throughout the entire case; that the burden of overcoming this presumption rests upon the government, and never shifts so as to rest upon the defendant; that a defendant is not called on to explain circumstances which are suspicious, but that the government must solve all reasonable doubts, so as to exclude from the minds of the jury through evidence adduced every reasonable, hypothesis except that of the guilt of the defendants. Unless the government has satisfied this requirement as to each defendant, the jury must acquit him concerning whom they find such a condition of failure to exist."

The instruction so requested fairly expresses in a general way the rule of law governing a criminal trial. But such law need not be declared in the language employed by counsel in making the request. If its substance is given in any form of statement, it is sufficient. The learned judge below in his charge told the jury as follows:

"This being a criminal prosecution, each of the defendants is presumed to be innocent until the contrary has been shown beyond a reasonable doubt. This presumption of innocence attends the defendants throughout the trial. The burden of overcoming this presumption rests upon the government, and never shifts to the defendants; and, unless the government has satisfied this requirement as to each defendant, the jury will acquit such defendant."

The portion of the charge just quoted embraces the substance of the declaration requested by the defendants' counsel. It literally covers the entire request, except that phase of it whereby the court was requested to tell the jury that the government must *"solve all reasonable doubts so as to exclude from the minds of the jury every reasonable hypothesis except that of the guilt of the defendants."* We think the thought covered by the last quoted and italicized words is necessarily conveyed in other portions of the charge. The jury were told that the presumption of innocence must be overcome by proof which satisfies them beyond a reasonable doubt of the guilt of each defendant. That language excludes the possibility of there being any reasonable hy-

pothesis except the guilt of the defendant; and obviously with a view of impressing the jury with its importance and of giving the defendants the full legitimate benefit of its protection the learned trial judge emphasized it by many repetitions. In view of these facts, there was no error in refusing to give the requested instruction.

Again, it is said the court below erred in not directing the jury to ignore slavery as distinguished from involuntary servitude in determining whether there was a conspiracy to deprive citizens of the right as charged. The phraseology of the request is not clear, inasmuch as it asks the court to declare that slavery was not a right against which the conspiracy was aimed. Of course, it was not. It was the freedom from slavery which constituted that right. But, apart from this verbal criticism, we cannot perceive how the differentiation suggested was necessary for the enlightenment of the jury. Whatever be the technical difference between the two, all the evidence clearly related to involuntary servitude. The theory of the case was that the negroes were subjected to a condition of enforced compulsory service. That is involuntary servitude within the meaning of the Constitution (Hodges v. United States, supra), and the court below after informing the jury what was charged in the indictment, and in so doing making use of the terms there employed, "involuntary servitude or slavery" in the disjunctive, thereafter repeatedly advised the jury to the effect that the issue before them was whether the negroes were compelled to remain in the service of the defendants against their will. In our opinion no confusion or prejudice against the defendants was created by the failure of the court to discriminate as requested between involuntary servitude and slavery.

We have carefully considered the remaining requests for instructions, the refusal of which is made ground of exception and error; but we find nothing in them embodying any principle of law applicable to the case as made, and requisite for the instruction of the jury, which was not substantially given in the main charge.

Exception was taken to the conduct of the trial judge in his remarks to the jury after submission of the cause to them. After they had taken it and had held it under consideration for nearly a day, they were called into court, and, on being advised that they had found difficulty in agreeing, the learned trial judge commented upon the desirability of their reaching an agreement, if possible. He took occasion to briefly review the evidence, and in doing so expressed his opinion about the credibility of one witness. It is true his review reasonably pointed to but one conclusion; but that resulted from the facts themselves, and not from his peculiar treatment of them. He expressed no personal opinion concerning their evidential value, but submitted the same to the jury in the form of interrogatories for their consideration. He did not undertake to tell the jury what the facts were, or that they were undisputed, but directed them to consider which of the facts referred to were disputed. What he said was well warranted by the case as made; and, while it was calculated to aid the jury in reaching a verdict, it was not in our opinion coercive in its character or unduly influencive upon the jury. They had been told in different ways that the responsibility of finding the facts rested with

them, and not with the court, and were undoubtedly fully impressed with a sense of that responsibility. In considering this matter we find that the assignment of errors is broader than the exceptions taken to the court's remarks just referred to. This cannot enlarge our inquiry beyond the exceptions so actually taken. They, in our opinion, were not well taken and cannot be sustained.

In the course of his remarks to the jury the learned trial judge referred to the evidence of one witness who had alone denied categorically and emphatically many facts concerning the treatment of the negroes on the Smith farms which had been affirmed in one way or another by at least forty witnesses. He told the jury that they knew what they thought, and also what he thought about that evidence and unhesitatingly said he did not believe it. In that immediate connection he again advised the jury that it was their province, and not his, to determine the credibility of witnesses and the value of their testimony. Notwithstanding his remarks, the jury, in our opinion, were left free to give such credence to the evidence in question as in their judgment it merited.

Comments concerning the value of evidence are not assignable for error when the jury are left at full liberty to determine the issues of fact for themselves. Freese v. Kemplay, 55 C. C. A. 258, 118 Fed. 428; Sebeck v. Plattdeutsche Volksfest Verein, 59 C. C. A. 531, 124 Fed. 11, and cases cited.

We have now concluded a consideration of all the assignments of error relied upon and argued by defendants' counsel, and, finding no reversible error in the proceedings below, the judgment must be affirmed, and it is so ordered.