**Collie Leroy WILKINS, Jr., and Eugene Thomas, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 23289.**

United States Court of Appeals Fifth Circuit.

April 27, 1967.

Rehearing and Rehearing En Banc Denied June 22, 1967.

Arthur J. Hanes, Fred Blanton, Birmingham, Ala., for appellants.

John Doar, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., Ben Hardeman, U. S. Atty., Montgomery, Ala., J. O. Sentell, Asst. U. S. Atty., David L. Norman, Louis M. Kauder, Alvin Hirshen, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before COLEMAN and DYER, Circuit Judges, and ESTES, District Judge.

COLEMAN, Circuit Judge:

In the United States District Court for the Middle District of Alabama, these appellants were convicted of and sentenced to the maximum term of imprisonment for a violation of section 241, Title 18, United States Code, which makes it a criminal offense to conspire against rights of citizens secured to them by the Constitution or laws of the United States.[1] We affirm.

The guilt or innocence of the appellants was submitted to the jury on an indictment which, after amendment by deletion during the charge to the jury, read as follows:

"Commencing on or about March 1, 1965 and continuing to on or about March 26, 1965, WILLIAM ORVILLE EATON,[2] COLLIE LEROY WILKINS, JR., and EUGENE THOMAS, within the Middle District of Alabama, conspired together, with each other and with other persons to the Grand Jury unknown, to injure, oppress, threaten and intimidate citizens of the United States in the vicinity of Selma and Montgomery, Alabama in the exercise and enjoyment of certain rights and privileges secured to them by the Constitution and laws of the United

---

1. "§ 241. Conspiracy against rights of citizens

 If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege sescured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or

 If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—

 They shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

 Former section 51 of this Title read as follows:

 "If two or more persons conspire to injure, oppress, threaten or intimidate any

citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars and imprisoned not more than ten years; and shall, moreover, be thereafter ineligible to any office or place of honor, profit, or trust created by the Constitution or laws of the United States."

 Act of May 31, 1870, 16 Stat. 141, Rev. Stat. § 5508, 18 U.S.C. § 51.

2. Mr. Eaton died during the pendency of this appeal and the case against him has been dismissed as moot.

States, and because of their having exercised such rights as follows:

\* \* \* \* \* \*

[(4)] The right to participate in a protest march from Selma to Montgomery, Alabama, to present a petition to the Governor of Alabama in Montgomery, and to participate in the carrying out of a proposed plan for such march pursuant to an order entered on March 17, 1965, by the United States District Court for the Middle District of Alabama, in the case of Williams v. Wallace, Civil Action Number 2181-N [240 F.Supp. 100].

\* \* \* \* \* \*

It was part of the plan and purpose of the conspiracy that the defendants would harass, threaten, pursue and assault citizens of the United States in the area of Selma and Montgomery, Alabama, who were participating in or had participated in, or who were lending or had lent their support to a demonstration march from Selma to Montgomery, Alabama, pursuant to the plan referred to above, that was approved by the order of the United States District Court for the Middle District of Alabama on March 17, 1965.

In violation of Section 241 of Title 18 United States Code."

The numbered sections *eliminated* by the Court read as follows:

(1) The right to publicly protest unlawful deprivation of the right of Negro citizens of Alabama to register to vote and to vote for candidates for federal office.

(2) The right to encourage and assist Negro citizens of Alabama in the exercise of their right to register to vote and to vote for candidates for federal office.

(3) The right to peaceably assemble, publicly protest, and petition the Governor of the State of Alabama for redress of grievances on behalf of Alabama.

(5) The right to travel to and from the State of Alabama and to use interstate highways and other instrumentalities of interstate commerce in and through Alabama.

In his charge to the jury the Court discusses these excisions as follows:

"You will only be concerned with the fourth paragraph, as numbered in this indictment—because of their having exercised the right to participate in a protest march—and I am going to, for your assistance, without obliterating, mark out the other four that are enumerated in the indictment, leaving only the fourth right that the Government in its indictment says the conspiracy was formed to oppress, threaten, and intimidate citizens in the exercise of, and this right is—to participate in a protest march from Selma to Montgomery, to present a petition to the Governor in Montgomery, and to participate in the carrying out of a proposed plan for such march pursuant to an order that had been entered on March 17, 1965, by the United States District Court in the Middle District of Alabama. The indictment says, further, that it was a part of the plan and purpose of the conspiracy that the defendants would harass, threaten, pursue, and assault citizens of the United States in the area of Selma and Montgomery, Alabama, who were participating in, or had participated in, or who were lending or had lent their support to a demonstration march from Selma to Montgomery pursuant to the plan that was just referred to, and which march had been approved by the court."

Whatever the reason, the affirmative allegations of these sections [1, 2, 3, 5] containing averments as to federal elections and traveling in interstate commerce were withdrawn from the consideration of the jury.

The Court order alluded to in the indictment, but not copied therein, will be

set forth in the margin.[3] It will be noted that the order does not mention protests, petitions, or federal elections. It mentions only the march and the plans for the march.

The opinion of the Court preliminary to the order, 240 F.Supp. 102, stated that the plaintiffs "seek to have this Court guarantee their right to assemble and demonstrate peaceably for the purpose of redressing their grievances concerning the right to register to vote in the State of Alabama without unlawful interferences". The Court further stated, "Under Alabama law, registration is prerequisite to voting in any election [including federal elections]".

On its face, Williams v. Wallace, supra, was a typical Fourteenth Amendment proceeding. It sought to enjoin State action. There were no defendants other than the governor and other named officials of the State of Alabama and Dallas County. The Court order was directed only against these officials, "their successors in office, agents, representatives, employees, and other persons in active concert and participation with them". State interference with the right to make the march according to prescribed plan was prohibited; state police protection was commanded. No private citizens were named as defendants or mentioned in the injunction. Yet, the right to qualify to vote in federal elections, undeniably a right of national citizenship, was an essential ingredient of the proceedings.

There is no contention that these appellants in any way acted with the knowledge of, approval of, or in concert with any state authority. Appellants contend that, if they violated the court order, redress should be in the form of contempt proceedings. Obviously, this has received little consideration, if any, because appellants were not parties to nor included in the order.

3. Ordered, adjudged and decreed that, pending further order of this Court, George C. Wallace, as Governor of the State of Alabama, Albert J. Lingo, as Director of Public Safety for the State of Alabama, and James G. Clark, Jr., as Sheriff of Dallas County, Alabama, their successors in office, agents, representatives, employees, and other persons in active concert and participation with them be and each is hereby restrained and enjoined from:

 (1) Arresting, harassing, threatening, or in any way interfering with the efforts to march or walk, or the marching or walking, by the plaintiffs, members of their class, and others who may join with them, along U. S. Highway 80 from Selma, Alabama, to Montgomery, Alabama, said march as presently approved by this Court, to commence in Selma, Alabama, not earlier than Friday, March 19, 1965, and not later than Monday, March 22, 1965, and to terminate in Montgomery, Alabama; and

 (2) Otherwise obstructing, impeding, or interfering with the peaceful non-violent efforts by said plaintiffs, members of their class, and others who may join with them, in protesting and demonstrating by assembling and by marching along U. S. Highway 80 from Selma, Alabama, to Montgomery, Alabama, as said march is proposed in plaintiffs' plan filed with this Court and served on the defendants on March 16, 1965, and to the extent that said plan is presently approved by this Court.

 It is further ordered, adjudged and decreed that, pending further order of this Court, the defendants George C. Wallace, as Governor of the State of Alabama, Albert J. Lingo, as Director of Public Safety for the State of Alabama, and James G. Clark, Jr., as Sheriff of Dallas County, Alabama, their successors in office, agents, representatives, employees, and all others acting in concert with them, be and each is hereby restrained and enjoined from failing to provide police protection for the plaintiffs, members of their class, and others who may join with them, in their march, as presently scheduled and presently approved by this Court, to commence not earlier than Friday, March 19, 1965, and not later than Monday, March 22, 1965, along U. S. Highway 80 from Selma, Alabama, to Montgomery, Alabama.

 It is further ordered, adjudged and decreed that the motion for preliminary injunction filed by the defendant Governor Wallace, the motion by the plaintiff-intervenor, United States of America, for relief in addition to that herein specifically granted, and the motion of the plaintiffs for relief in addition to that herein specifically granted be and each is hereby denied.

Although the court order on which the prosecution was based was essentially Fourteenth Amendment action against state officials, the Government in its brief (page 27) stipulates:

"We do not deal with consideration of rights under the Fourteenth Amendment and the requirement or the immateriality of some degree of State action. The asserted federal right here derives from an explicit federal court order, specific in terms of time, place, and purpose. The right of which we speak is no less protected from private interference than it is from official interference".

In its supplemental brief, filed in response to a request from the Court, the Government reiterates its original position, as follows:

"[T]he right to enjoy the benefits of the federal court order entered by Judge Johnson is derived from Article III of the Constitution and exists without regard to the Fourteenth Amendment. That being so, we urged [in the original brief] that, like other distinctly national rights, privileges, and immunities, it is protected from interference by conspiracies of private persons, whether or not state officers are involved in the conspiracy. We adhere to that view".

I

The essential facts supporting the guilty verdict, shown by the testimony of eyewitnesses, will now be summarized.

The Court order was entered March 17, 1965. The march commenced in Selma on March 21. It ended at the State Capitol in Montgomery on March 25. On March 21 the Ku Klux Klan of America, Inc., held a rally at Crampton Bowl in Montgomery and conducted a public parade in that City, the announced purpose of which [stated in the request for a parade permit] was "to protest [an] order issued by [a] Federal Court allowing a five day demonstration march from Selma, Alabama, to Montgomery, Alabama". That these appellants attended the protest rally and participated in the parade was established by an abundance of proof.

The jury was specifically instructed that appellants had a right to attend the protest meeting and to participate in the parade. Nevertheless, the evidence was highly relevant as to their actual notice of the existence of a court order. It was relevant as to the intent of the appellants when they traveled, as will later be set forth, to Montgomery and Selma on March 25. It would justify a jury finding that as early as March 21 these appellants had begun acting in concert in opposition the march.

On March 25, the day the march was scheduled to arrive, and did arrive, at the Capitol in Montgomery, a government informer, posing as a member of the Ku Klux Klan, whose FBI connection was then unknown to these appellants, received a telephone call from Eugene Thomas advising that he [Thomas] had to join a group of Klansmen and go to Montgomery that day. Immediately thereafter, a Klan official telephoned the informer to go to Montgomery, stating that this instruction came from the Imperial Office of the Klan. The informer then contacted an agent of the Federal Bureau of Investigation and was instructed to go to Montgomery along with the appellant Thomas and any others who might accompany him.

Thereafter, the informer met Eugene Thomas, Collie Leroy Wilkins, and William Orville Eaton at a point about two blocks from the Klan meeting hall in Bessemer, Alabama. All four men then went to Montgomery in Thomas' automobile, arriving about 10 o'clock, A.M. The informer, as well as Eaton and Thomas, was armed but the guns were left in the parked automobile, after which they went to a filling station near the Capitol, where they remained for about five hours. While at the filling station, the appellants harassed the marchers, shouted at them, booed them, and got into an argument with some of the Negro spectators.

Upon the conclusion of the speechmaking at the Capitol, all four men returned

to the automobile and went to a restaurant. On the way there, Eugene Thomas announced that they were going to Selma. Eaton asked why and Thomas replied, "We got things to do, and we are going to get them done". After leaving the restaurant they spotted a hitchhiker on the road and Eaton said, "There is a hitchhiker, wonder if it is one of the marchers?" Wilkins replied, "I don't know, slow down, * * * we will see. If it is, we will give him a little fun and a surprise". Upon a closer approach, Wilkins said, "No, he is not a marcher, he is too clean to be a marcher". The hitchhiker was not disturbed.

After being stopped at a Highway Patrol radar speed check point on Highway 80, where Thomas received a warning ticket for an improper muffler, the party of four completed the journey to Selma. They went to a cafe, where they remained for about thirty or forty-five minutes. An individual there, identified as one charged in the "Reeb killing", came up to Eugene Thomas, put his arm on his shoulder, and said, "God bless you, boys, * * * you go do your job, I have already did (sic) mine".

Upon leaving the Silver Moon Cafe, the party then drove toward the church where the marchers had gathered. Eugene Thomas was the driver, Eaton sat beside him on the front seat, the informer sat behind Thomas, and Wilkins was behind Eaton.

Near the church they saw a couple of Negroes walking down a dirt street. Eugene Thomas slowed the car down and said, "Looka there, * * * We are going to have some fun", or—words to that effect. Wilkins told the informer, "Get ready, Baby Brother, we are going to take them". When they were within a short distance of the people, the informer saw an Army truck with soldiers sitting within and exclaimed, "be careful, there is troops up there, the best thing we can do is get the hell out of here". At that they passed these people and drove on. During the period when they had spotted these people, and while the car slowed down, Eugene Thomas took his gun from between the seats and handed it to Wilkins, but when they noticed the Army truck the gun was replaced between the seats.

Leaving this scene, the party then drove through Selma toward the Alabama River bridge. About two or three blocks West of the bridge they stopped for a traffic light and saw a light colored Oldsmobile bearing a Michigan license plate. A white woman was driving the car and a Negro was seated in the front seat with her. The following conversation ensued:

Eugene Thomas: "Wonder—wonder where they are going? Let's follow them, we are going to see where they are going, I think they are going out to the woods on a dirt road and park somewhere together".

Thomas then told the others to get down in the back, below window level, because "we are going to follow them and take them." Thomas then said, "I believe we got some of the brass. We are going to get them tonight".

After the informer and Wilkins had been down in the back seat for several minutes and while Thomas was following the Oldsmobile he told them to sit up again. They continued to follow the Michigan car and Thomas said again, "All right men * * * tonight is the night we are going to take them".

While Thomas was trying to catch the Oldsmobile he said to the informer, "Baby Brother * * * get ready, we are going to get them on our side".

As Thomas started to pull alongside the Oldsmobile the informer saw Craig Air Force Base to the right in front of them. He told Thomas to "go back" because "that woman is trying to turn into the Air Force Base". Thomas said, "Nope * * * we are going to get them tonight". At this time the Oldsmobile veered to the right as if it were going to turn into the Air Force Base, but it did not. It veered out and the woman driver stepped on the gas and went on down the highway.

Eugene Thomas followed it at speeds of eighty to ninety miles an hour and exclaimed, "Well, this is a good place * * * we will take them now". Wilkins told Thomas that he better be careful because the highway patrol radar is "right up there a little piece". However, Thomas continued to chase the Oldsmobile and throughout the chase the discussion was that they were "going to get them tonight". Thomas asked whether he should bump the automobile in order to stop it. Wilkins answered, "No, brother * * * you can't stop it like that; if you get one speck of paint on this automobile, we will get caught * * *. You just get up beside of it, and we will stop it".

When the pursuing car overtook the Oldsmobile Thomas said, "this is it * * * we are going to take them right here and now". Wilkins stuck his arm out the window, with Thomas' pistol in hand, and as the woman driver of the other car turned her head toward them Wilkins fired two shots into the front window of her automobile. At this point, Eugene Thomas said, "Shoot the hell out of them, everybody shoot the hell out of them". Eaton began firing his .22 pistol, loaded with shaved bullets. Wilkins continued to fire as their car passed the automobile. Eaton was leaning out of the car trying to fire. The Oldsmobile continued straight down the highway and the informer stated that the shooters had missed [the target]. Wilkins responded, "Baby brother, don't worry. I don't miss. That * * * and * * * are dead and in hell".

Wilkins and Eaton threw their cartridge casings out the window. When they reached Bessemer they attempted to arrange alibis.

The dead body of the woman driver of the Oldsmobile was, of course, soon found. The proof showed that she had participated in the march and had given aid and assistance to others who did participate. The informer immediately reported what he had witnessed.

 As stated in the outset, these are the bare, unadorned essentials of the evidence upon which the jury returned its verdict. There was extensive, detailed corroboration. We have not the slightest doubt that this evidence, credited by the jury in its verdict, along with the inferences reasonably to be drawn therefrom, was quite enough to support the verdict that these appellants did intentionally conspire against citizens participating in the march and/or petitioning the Governor of Alabama for a redress of grievances.

## II

Section 241 of Title 18, U.S.C. originated as § 2 of the Act of April 9, 1866, 14 Stat. 27. It later became § 6 of the Act of May 31, 1870, 16 Stat. 141. It has since existed as § 5508 of the revised statutes of 1874–1878, as § 19 of the Criminal Code of 1909, 35 Stat. 1092, and as § 51 of the United States Code, 1926 Codification, 44 Stat. 462. It came to its present form in the 1948 revision of the United States Code. For a comparative table of the various forms of these several statutes, see the Appendix to the opinion of Mr. Justice Frankfurter in United States v. Williams (1951), appearing at page 83 of 341 U.S. Reports, 71 S.Ct. 581, 95 L.Ed. 758.

A detailed judicial history of the statute prior to 1892 is to be found in the opinion of Mr. Justice Gray in Logan v. United States, beginning at page 281 of 144 U.S. Reports, 12 S.Ct. 617, 36 L.Ed. 429.

Two of the latest decisions of the Supreme Court of the United States are, of course, United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239, and United States v. Price, 383 U.S. 787, 86 S.Ct. 1152, 16 L.Ed.2d 267, (both decided March 28, 1966).

*Price* was concerned with an alleged conspiracy to deprive three individuals of their Fourteenth Amendment rights. Fourteenth Amendment rights were held to be within the purview of 18 U.S.C. § 241, and private individuals alleged to have been acting in concert with state officers were held to be acting under color of law.

In United States v. Guest, supra, all those indicted were private individuals. In one respect, the indictment was held sufficient to charge a violation of Fourteenth Amendment rights under § 241. In the opinion of the Court, 383 U.S. 745, 755, 86 S.Ct. 1170, 1176, 16 L.Ed.2d 239, we find the following language:

"It is a commonplace that rights under the Equal Protection Clause itself arise only where there has been involvement of the State or of one acting under the color of its authority. The Equal Protection Clause 'does not * * * add anything to the rights which one citizen has under the Constitution against another.' United States v. Cruikshank, 92 U.S. 542, 554–555, 23 L.Ed. 588. As Mr. Justice Douglas more recently put it, 'The Fourteenth Amendment protects the individual against state action, not against wrongs done by individuals.' United States v. Williams, 341 U.S. 70, 92, [71 S.Ct. 581, 95 L.Ed. 758] (dissenting opinion). This has been the view of the Court from the beginning. United States v. Cruikshank, supra; United States v. Harris, 106 U.S. 629, [1 S.Ct. 601, 27 L.Ed. 290]; Civil Rights Cases, 109 U.S. 3, [3 S.Ct. 18, 27 L.Ed. 835]; Hodges v. United States, 203 U.S. 1, [27 S.Ct. 6, 51 L.Ed. 65]; United States, v. Powell, 212 U.S. 564, [29 S.Ct. 690, 53 L.Ed. 653]. It remains the Court's view today. See, e. g., Evans v. Newton, 382 U.S. 296, [86 S.Ct. 486, 15 L.Ed.2d 373]; United States v. Price, post, p. 787, [86 S.Ct. 1152, 16 L.Ed.2d 267]."

The Court went on to say that the involvement of the State need not be either exclusive or direct.

*Guest* further held that if the predominant purpose of a conspiracy is to impede or prevent exercise of the right of interstate travel, or to oppress a person because of his exercise of that right, then, whether or not motivated by racial discrimination, the conspiracy is a proper object of 18 U.S.C. § 241.

In the case now before us, we are dealing exclusively with the acts of private individuals and the Government expressly concedes that the case presents no Fourteenth Amendment question.

That being true, we must determine whether the alleged conspiracy violated "safety and protection to persons in the exercise of rights dependent on the laws of the United States, including, of course, the constitution and treaties as well as statutes * * * *", United States v. Waddell, 112 U.S. 76, 79, 5 S.Ct. 35, 36, 28 L.Ed. 673 (1884).

We now quote what the Supreme Court said in *Logan* concerning *Cruikshank,* supra:

"In United States v. Cruikshank, 92 U.S. 542, [23 L.Ed. 588], at the same term, in which also the opinion was delivered by the chief justice, the indictment was on section 6 of the enforcement act of 1870, (re-enacted in Rev.St. § 5508, under which the present conviction was had,) and the points adjudged on the construction of the constitution and the extent of the powers of Congress were as follows:

It was held that the first amendment of the constitution, by which it was ordained that congress should make no law abridging the right of the people peaceably to assemble and to petition the government for a redress of grievances, did not grant to the people the right peaceably to assemble for lawful purposes, but recognized that right as already existing, and did not guarantee its continuance except as against acts of congress; and therefore the general right was not a right secured by the constitution of the United States. But the court added: *'The right of the people peaceably to assemble for the purpose of petitioning congress for a redress of grievances, or for anything else connected with the powers or the duties of the national government, is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by, the United States.* [Emphasis added]. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peace-

ably for consultation in respect to public affairs, and to petition for a redress of grievances. If it had been alleged in these counts that the object of the defendants was to prevent a meeting for such a purpose, the case would have been within the statute, and within the scope of the sovereignty of the United States.' 92 U.S. 552, 553."

In United States v. Cruikshank, supra, the Court said this:

"From this it appears that the right of suffrage is not a necessary attribute of national citizenship: but that exemption from discrimination in the exercise of that right on account of race, &c. is. The right to vote in the States comes from the States; but the right of exemption from the prohibited discrimination comes from the United States. The first has not been granted or secured by the Constitution of the United States; but the last has been."

 Since *Cruikshank*, it has been well settled that the right to vote in elections for the selection of federal officials, in accordance with applicable State law, is a right secured by the federal Constitution. See United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274; United States v. Mosley, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355. Conspiracies to injure, oppress, threaten, or intimidate any citizen in the exercise of or for having exercised this right are in violation of 18 U.S.C. § 241, United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341; Fields v. United States, 4 Cir., 1955, 228 F.2d 544; Crolich v. United States, 5 Cir., 1952, 196 F.2d 879, cert. denied, 344 U.S. 830, 73 S.Ct. 36, 97 L.Ed. 646 (1952).

In Powe v. United States, 1940, 109 F.2d 147, 151, this Court held that the right to speak freely and print about matters *in general* was not secured by the Constitution and laws of the United States, but the Court went ahead to quote from *Cruikshank*, 92 U.S. at 552, the language we have already cited, "if it had been alleged * * * that the

object of the defendants was to prevent a meeting for such a purpose, the case would have been within the statute, and within the scope of the sovereignty of the United States".

 The Selma to Montgomery march (assembly) was not in connection with any specifically impending federal election. The proceedings in Williams v. Wallace, supra, were expressly pleaded in the indictment, however, by title and number. Those proceedings directly concerned the denial of the right to register to vote in federal elections and with an assembly for the purpose of protesting that condition. Therefore, guided by the cited language in *Cruikshank*, we hold that any citizen of the United States participating in the march was exercising an attribute of national citizenship, guaranteed by the United States, and that a conspiracy against those participating would be a violation of 18 U.S.C., § 241.

We thus find it unnecessary to pass upon the contention of the Government that the rights of the participants emanated from the Court Order, that the Court Order emanated from the Constitution and laws of the United States, and that such Court Order thus conferred a right within the ambit of § 241.

In touching upon this point, however, we would point out that the Court Order was directed solely to state action and the Government admits that there was none here involved. Moreover, we are impressed with the consideration that if a right or privilege is secured by the Constitution or laws of the United States it requires no advance validation by a court order. Likewise, if not so secured it would be hard to see how a court order could do that which the Constitution or the federal laws had failed to do. The Court Order was, however, a very pertinent factor in the alleged offense in that it described times, places, and the nature of the federally guaranteed rights to be exercised. It thus fully informed the defendants of the offense charged against them and it limited the bounds within which the prosecution had to operate.

## III

### APPELLANTS' ATTACK UPON THE CONVICTION

The defendants in the Court below made a timely motion to dimiss the indictment on the ground that it did not state an offense against the United States. What we have already said in Section II provides the answer to this point.

What are the essential requisites of a valid indictment for a violation of § 241?

■ It must allege that it was the intent of the defendants, by their conspiracy, to hinder or prevent the enjoyment of some right granted or secured by the Constitution, and must charge positively and not inferentially everything essential, United States v. Cruikshank, supra.

It is not necessary, however, that the indictment should set out in detail the evidence of conspiracy or to describe it with the same degree of particularity required in an indictment for the substantive offense, Crolich v. United States, supra.

■ Neither is it necessary to aver any overt act. Any such averment must necessarily be referred to the charge of conspiracy as describing or particularizing such charge, Smith v. United States, 8 Cir., 1907, 157 F. 721, cert. denied, 208 U.S. 618, 28 S.Ct. 569, 52 L.Ed. 647 (1908). See also, Montoya v. United States, 8 Cir., 1919, 262 F. 759.

On the other hand, an indictment [under former section 51] which charged that defendants conspired to injure, etc., certain named persons, male citizens of Kentucky over 21 years of age, "in the free exercise and enjoyment of a right and privilege secured to them" was bad as indefinite, in that it failed to state what particular right and privilege was meant, though it continued with a recital that the defendants were officers of an election precinct, conspired together "for the purposes aforesaid", and "to carry out and effect the object of the same" failed to open the polls promptly, and by a tardy discharge of their duties and frequent absences prevented the persons named from voting, McKenna v. United States, 6 Cir., 1904, 127 F. 88.

■ Not only must a specific intent to interfere with a federal right be alleged in the indictment but it must be proven by the evidence beyond a reasonable doubt, Buchanan v. United States, 8 Cir., 1916, 233 F. 257; United States v. Guest, supra.

■ These appellants had full notice of the proceedings and Court order in Williams v. Wallace. They took an active part in protesting the order. The Court order, including the plan of march, was introduced in evidence and submitted to the jury. Appellants never at any time objected to or took exception to the form of the indictment but stood on the proposition that it charged no offense under the laws of the United States. The District Court correctly denied the motion to dismiss.

■ Appellants urge that reversible error was committed in the denial of their motion for a bill of particulars in which they sought the names of any others with whom they were charged to have conspired, demanded specification of the overt acts, if any, committed in furtherance of the alleged conspiracy, and demanded the names of the persons conspired against. It will be noted from what we have already said that in a § 241 prosecution it is not necessary that overt acts be averred. In the hearing on the motion, Government counsel verbally stipulated that there were no other known conspirators. As to the names of those conspired against, the Government responded, "We contend that the defendants conspired to injure members of a class of people; the people are those persons that were engaged in the march from Selma to Montgomery, and those persons are identified; we don't claim any individual person". There was no effort at the trial to prove the names of other conspirators; further, the proof was all directed to oppressive action taken against marchers as such. Ob-

viously, the appellants themselves did not know and could not have known in advance the names of those participating in the march. They did not know the individual names of those whom they later encountered in Montgomery or on the highway to Selma or on the return trip to Montgomery. The proof, as already discussed, was sufficient to support a jury finding that the appellants were conspiring against persons whom they believed to have participated in the march. Apparently they cared not what their names were. The prosecutor is not required to detail his evidence in response to a bill of particulars; it is only necessary that defendants be advised of any essential detail omitted from the indictment, 8 Moore, Federal Practice 7–28 (1965 ed.). At the hearing on the motion the defendants, in fact, learned all they could have obtained had the motion been granted. There was no error in this regard.

■ The record reveals that much of the trial was centered on the shooting of the woman in the automobile, but this was competent to show intent, an indispensable element of the offense and one which had to be proved by the evidence beyond a reasonable doubt. The appellants were not on trial for the shooting; yet it hardly can be disputed that the acts of the parties were highly relevant as to the presence or absence of guilty intent.

■ Appellants next say that the evidence was insufficient to support the verdict. Leaving aside the omission of a motion for a directed verdict at the close of all the evidence, as required by Rule 29, F.R.Cr.P., which operates as waiver of the benefit of the earlier motion, we have no hesitation in holding, as reflected in our preceding discussion of the proof, that the evidence was more than ample to sustain the conviction.

■ Appellants next complain of the admission of at least eight different categories of documentary, pictorial, and physical evidence, as well as testimony. These contentions have been carefully considered but we can perceive no good service to be performed by unduly prolonging an already lengthy opinion in a discussion of these points. Counsel are to be commended for the diligent manner in which they have raised these points but we perceive no basis for saying that any error was committed in this respect. As to the search of the home of one of the appellants there was no objection below, see Rule 41(e), F.R.Cr.P.

■ It is next complained that the trial court should not have allowed the Government to close the arguments to the jury and that he should not have charged, although appellants requested it, that defendants' failure to testify could not be considered in determining their guilt or innocence. These contentions are without merit.

■ There was no error in the original charge to the jury. In fact, upon its completion and upon being given an opportunity to state any objections or exceptions defense counsel very properly stated that they were entirely satisfied with it.

The author of this opinion has heretofore stated his individual views of the Allen charge, given after the jury for some time had been considering its verdict. To date, however, the decisions are to the contrary, see Thaggard v. United States, 5 Cir., 354 F.2d 735, cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966).

The crucial issue in this case was whether the acts alleged and shown to have been committed constituted a violation of 18 U.S.C. § 241. Being of the opinion that the question must be answered in the affirmative, and so answering it, the judgment of conviction must be

Affirmed.